**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MAIN STREET AMERICA ASSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>HOWARD LYNCH PLASTERING, INC.<br><br>and<br><br>W.B. HOMES, INC.,<br><br>Defendants. | : | Case No.: 2:21-cv-3977 |

## COMPLAINT

Plaintiff Main Street America Assurance Company ("MSAAC") sues Howard Lynch Plastering, Inc. ("Howard Lynch") and W.B. Homes, Inc. ("W.B. Homes") and alleges as follows:

## INTRODUCTION

1. This action concerns MSAAC's obligations under general liability insurance policies that MSAAC issued to Howard Lynch, a plastering and stucco subcontractor (the "MSAAC Policies").

2. Specifically, MSAAC seeks a declaration that it does not owe a duty to defend, indemnify, or reimburse Howard Lynch (its insured) or W.B. Homes (which is seeking coverage as an additional insured) under the MSAAC Policies in connection with a lawsuit, 32 claims, and a private arbitration proceeding, all of which were brought by the individual homeowners of 34 single-family homes (the "Homes") against W.B. Homes, the general contractor for the Homes, and/or Howard Lynch, the stucco subcontractor, for alleged construction defects and damages at the Homes.

3. 32 of the 34 Homes[1] are the subject of claims made by the homeowners against W.B. Homes (the "Claims").

4. The remaining two Homes are, or have previously been, the subject of legal proceedings against W.B. Homes. The Home owned by Rodwige and Camille Desnoyers, 592

[1] The 32 Homes that are the subject of the Claims are: (1) Stephen Etzler & Jody L. Buller ("Etzler Home"), 181 Wrenfield Way, Harleysville, Pennsylvania 19438; (2) Hubert & Karen Jasinski ("Jasinski Home"), 190 Wrenfield Way, Harleysville, Pennsylvania 19438; (3) Scott & Traci A. Jones ("Jones Home"), 930 Ashbourne Way, Schwenksville, Pennsylvania 19473; (4) Antony & Chandra Vargeese ("Vargeese Home"), 926 Ashbourne Way, Schwenksville, Pennsylvania 19473; (5) Shaun & Sheri Humphrey ("Humphrey Home"), 918 Ashbourne Way, Schwenksville, Pennsylvania 19473; (6) Kevin Faikish ("Faikish Home"), 912 Ashbourne Way, Schwenksville, Pennsylvania 19473; (7) Janice Leone & Sara Picard ("Leone Home"), 900 Ashbourne Way, Schwenksville, Pennsylvania 19473; (8) Steven & Diane Foxman ("Foxman Home"), 890 Ashbourne Way, Schwenksville, Pennsylvania 19473; (9) David & Sarah Davidar ("Davidar Home"), 886 Ashbourne Way, Schwenksville, Pennsylvania 19473; (10) Jeffrey Legos & Susan Amilcare-Legos ("Legos Home"), 880 Ashbourne Way, Schwenksville, Pennsylvania 19473; (11) Armen & Sharon DiFilippo ("DiFilippo Home"), 876 Ashbourne Way, Schwenksville, Pennsylvania 19473; (12) Richard & Darlene Blakely ("Blakely Home"), 872 Ashbourne Way, Schwenksville, Pennsylvania 19473; (13) Anne Marie O'Flynn & Kenneth Cameron ("O'Flynn Home"), 875 Ashbourne Way, Schwenksville, Pennsylvania 19473; (14) Jonathon & Chantelle Manley ("Manley Home"), 879 Ashbourne Way, Schwenksville, Pennsylvania 19473; (15) Sushil Bhalla & Mary Lutz ("Bhalla Home"), 990 Integrity Drive, Schwenksville, Pennsylvania 19473; (16) Carmen & Monica Rocco ("Rocco Home"), 885 Ashbourne Way, Schwenksville, Pennsylvania 19473; (17) Stephen Szatkowski & Katherine O'Bren ("Szatkowski Home"), 889 Ashbourne Way, Schwenksville, Pennsylvania 19473; (18) Robert & Anne Mullins ("Mullins Home"), 893 Ashbourne Way, Schwenksville, Pennsylvania 19473; (19) James & Bonnie DePermentier ("DePermentier Home"), 897 Ashbourne Way, Schwenksville, Pennsylvania 19473; (20) Michael Zirinsky & Kellie Fine ("Zirinsky Home"), 901 Ashbourne Way, Schwenksville, Pennsylvania 19473; (21) Steven Hahn & Linda Stanley ("Hahn Home"), 905 Ashbourne Way, Schwenksville, Pennsylvania 19473; (22) Joseph & Patrice Steck ("Steck Home"), 909 Ashbourne Way, Schwenksville, Pennsylvania 19473; (23) Jason & Tobi Klaskin ("Klaskin Home"), 913 Ashbourne Way, Schwenksville, Pennsylvania 19473; (24) John Hewlett ("Hewlett Home"), 917 Ashbourne Way, Schwenksville, Pennsylvania 19473; (25) Michael & Linda Reino ("Reino Home"), 921 Ashbourne Way, Schwenksville, Pennsylvania 19473; (26) Eric & Sharon MacDougall ("MacDougall Home"), 925 Ashbourne Way, Schwenksville, Pennsylvania 19473; (27) Syed & Sumbul Ali ("Ali Home"), 929 Ashbourne Way, Schwenksville, Pennsylvania 19473; (28) Krista & John Devlin ("Devlin Home"), 431 Komen Court, Collegeville, Pennsylvania 19426; (29) David L. & Susan Harbaugh ("Harbaugh Home"), 397 Augusta Drive, Telford, Pennsylvania 18969; (30) Edward & Christine Blair ("Blair Home"), 590 Oakmont Drive West, Telford, Pennsylvania 18969; (31) Joseph & Kathleen Pisoni ("Pisoni Home"), 398 Augusta Drive, Telford, Pennsylvania 18969; (32) Nasseff Justin Guirguis ("Guirguis Home"), 1108 Kingsley Hall Drive, Lansdale, Pennsylvania 19446.

Oakmont Drive West, Telford, Pennsylvania 18969, was previously the subject of a private arbitration brought by the Desnoyers against W.B. Homes in 2015 ("Desnoyers Arbitration"). The Home owned by William and Rose Marie McGinnis, 2573 Muirfield Way, Lansdale, Pennsylvania 19446, is currently the subject of the lawsuit captioned *William McGinnis and Rose Marie McGinnis v. W.B. Homes, Inc., et al.*, Civil Action No. 2018-19272 ("McGinnis Lawsuit"), which was filed on or about July 31, 2018, in the Court of Common Pleas of Montgomery County, Pennsylvania. The McGinnises filed their Complaint against W.B. Homes, and then W.B. Homes joined Howard Lynch as an additional defendant in the Lawsuit. The McGinnis Lawsuit and the Desnoyers Arbitration are collectively referred to herein as the "Legal Proceedings."

5. The homeowners' Claims and the claims alleged in the Legal Proceedings seek damages caused by the allegedly defective construction of the Homes.

6. W.B. Homes has demanded economic damages in excess of $1,767,133 in connection with the Claims and the Legal Proceedings.

7. The primary bases for the declarations sought by MSAAC are that: (1) the homeowners' Claims and the claims in the Legal Proceedings against Howard Lynch are not, as a matter of law, claims for property damage caused by an occurrence; (2) W.B. Homes does not qualify as an additional insured under the MSAAC Policies for the Claims or the Legal Proceedings; and (3) even if W.B. Homes was an additional insured under the MSAAC Policies, the homeowners' Claims and the claims in the Legal Proceedings against W.B. Homes are not, as a matter of law, claims for property damage caused by an occurrence.

8. MSAAC is currently defending Howard Lynch in the McGinnis Lawsuit subject to a full reservation of MSAAC's rights.

9. There is a justiciable controversy concerning MSAAC's obligations under the MSAAC Policies with respect to Howard Lynch because MSAAC believes that it does not have an obligation to defend, indemnify, or reimburse Howard Lynch in connection with the Claims and the Legal Proceedings, while Howard Lynch believes that MSAAC is obligated to defend, indemnify, and reimburse Howard Lynch in connection with the Claims and the Legal Proceedings. There is also a justiciable controversy concerning MSAAC's obligations under the MSAAC Policies with respect to W.B. Homes because MSAAC believes that W.B. Homes is not an additional insured under the MSAAC Policies and that it does not have an obligation to defend, indemnify, or reimburse W.B. Homes in connection with the Claims and the Legal Proceedings, while W.B. Homes believes that it is an additional insured under the MSAAC Policies and that MSAAC is obligated to defend, indemnify, or reimburse W.B. Homes in connection with the Claims and the Legal Proceedings. The purpose of this case is to resolve these disputes.

**PARTIES**

10. MSAAC is a Florida corporation with its principal place of business in Jacksonville, Florida.

11. Howard Lynch is a Pennsylvania corporation with its principal place of business in Pottstown, Pennsylvania.

12. W.B. Homes is a Pennsylvania corporation with its principal place of business in North Wales, Pennsylvania.

## JURISDICTION AND VENUE

13. This Court has jurisdiction under 28 U.S.C. § 1332 because no plaintiff is a citizen of the same state as any defendant, a citizen of a foreign state is an additional party, and the amount in controversy exceeds $75,000.

14. This Court has jurisdiction over this declaratory judgment action under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*

15. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTS COMMON TO ALL COUNTS

### A. The MSAAC Policies

16. The MSAAC Policies bear policy number MPU2185F and were issued for consecutive, annual policy periods from November 1, 2011 to November 1, 2012; November 1, 2012 to November 1, 2013; and November 1, 2013 to November 1, 2014. Copies of the MSAAC Policies are attached as **Exhibits A**, **B**, and **C**.

17. The MSAAC Policies include a Businessowners Coverage Form ("Coverage Form").

18. The Coverage Form includes the following pertinent Business Liability Coverage language:

> **A. Coverages**
>
> **1. Business Liability**
>
> **a.** We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages

for "bodily injury", "property damage" or "personal or advertising injury", to which this insurance does not apply.

* * *

**b.** This insurance applies:

**(1)** To "bodily injury" and "property damage" only if:

**(a)** The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

**(b)** The "bodily injury" or "property damage" occurs during the policy period[.]"

* * *

**B. Exclusions**

**1. Applicable To Business Liability Coverage**

This insurance does not apply to:

* * *

**b. Contractual Liability**

"Bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement. This exclusion does not apply to liability for damages:

**(1)** That the insured would have in the absence of the contract or agreement; or

**(2)** Assumed in a contract or agreement that is an "insured contract", provided the "bodily injury" or "property damage" occurs subsequent to the execution of the contract or agreement. Solely for the purposes of liability assumed in an "insured contract", reasonable attorney fees and necessary litigation expenses incurred by or for a party other than an insured are deemed to be damages because of "bodily injury" or "property damage", provided:

**(a)** Liability to such party for, or for the cost of, that party's defense has also been assumed in the same "insured contract"; and

**(b)** Such attorney fees and litigation expenses are for defense of that party against a civil or alternative dispute resolution proceeding in which damages to which this insurance applies are alleged.

*** * ***

**k. Damage to Property**

"Property damage" to:

*** * ***

**(5)** That particular part of real property on which you or any contractor or subcontractor working directly or indirectly on your behalf is performing operations, if the "property damage" arises out of those operations; or

**(6)** That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed on it.

*** * ***

Paragraph **(6)** of this exclusion does not apply to "property damage" included in the "products-completed operations hazard".

*** * ***

**m. Damage To Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".

This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.

**n. Damage To Impaired Property Or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured, arising out of:

**(1)** A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

**(2)** A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

*** * ***

**E. Liability And Medical Expenses General Conditions**

*** * ***

**2. Duties In The Event Of Occurrence, Offense, Claim Or Suit**

**a.** You must see to it that we are notified as soon as practicable of an "occurrence" or an offense which may result in a claim. To the extent possible, notice should include:

**(1)** How, when and where the "occurrence" or offense took place;

**(2)** The names and addresses of any injured persons and witnesses; and

**(3)** The nature and location of any injury or damage arising out of the "occurrence" or offense.

**b.** If a claim is made or "suit" is brought against any insured, you must:

**(1)** Immediately record the specifics of the claim or "suit" and the date received; and

**(2)** Notify us as soon as practicable.

You must see to it that we receive written notice of the claim or "suit" as soon as practicable.

**c.** You and any other involved insured must:

**(1)** Immediately send us copies of any demands, notices, summonses or legal papers received in connection with the claim or "suit";

**(2)** Authorize us to obtain records and other information;

**(3)** Cooperate with us in the investigation, or settlement of the claim or defense against the "suit"; and

**(4)** Assist us, upon our request, in the enforcement of any right against any person or organization that may be liable to the insured because of injury or damage to which this insurance may also apply.

**d.** No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

*** * ***

**F. Liability And Medical Expenses Definitions**

**8.** "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:

**a.** It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

**(1)** The repair, replacement, adjustment or removal of "your product" or "your work"; or

**(2)** Your fulfilling the terms of the contract or agreement.

*** * ***

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

*  *  *

**16.** "Products-completed operations hazard":

**a.** Includes all "bodily injury" and "property damage" occurring away from premises you own or rent and arising out of "your product" or "your work" except:

**(1)** Products that are still in your physical possession; or

**(2)** Work that has not yet been completed or abandoned. However, "your work" will be deemed completed at the earliest of the following times:

**(a)** When all of the work called for in your contract has been completed.

**(b)** When all of the work to be done at the job site has been completed if your contract calls for work at more than one job site.

**(c)** When that part of the work done at the job site has been put to its intended use by any other person or organization other than another contractor or subcontractor working on the same project.

Work that may need service, maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed.

The "bodily injury" or "property damage" must occur away from premises you own or rent, unless your business includes the selling, handling or distribution of "your product" for consumption on premises you own or rent.

**b.** Does not include "bodily injury" or "property damage" arising out of:

**(1)** The transportation of property, unless the injury or damage arises out of a condition in or on a vehicle not owned or operated by you, and that condition was created by the "loading or unloading" of that vehicle by any insured; or

**(2)** The existence of tools, uninstalled equipment or abandoned or unused materials.

* * *

**17.** "Property damage" means:

**a.** Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.** Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it. . . .

* * *

**21.** "Your product":

**a.** Means:

**(1)** Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

**(a)** You;

**(b)** Others trading under your name; or

**(c)** A person or organization whose business or assets you have acquired; and

**(2)** Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your product"; and

**(2)** The providing of or failure to provide warnings or instructions.

**c.** Does not include vending machines or other property rented to or located for the use of others but not sold.

**22.** "Your work":

**a.** Means:

**(1)** Work or operations performed by you or on your behalf; and

**(2)** Materials, parts or equipment furnished in connection with such work or operations.

**b.** Includes:

**(1)** Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work"; and

**(2)** The providing of or failure to provide warnings or instructions.

*** * ***

**H. Other Insurance**

**1.** If there is other insurance covering the same loss or damage, we will pay only for the amount of covered loss or damage in excess of the amount due from that other insurance, whether you can collect on it or not. But we will not pay more than the applicable Limit of Insurance of Section I–Property.

**2.** Business Liability Coverage is excess over:

**a.** Any other insurance that insures for direct physical loss or damage; or

**b.** Any other primary insurance available to you covering liability for damages arising out of the premises or operations for which you have been added as an additional insured by attachment of an endorsement.

**3.** When this insurance is excess, we will have no duty under Business Liability Coverage to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so; but we will be entitled to the insured's rights against all those other insurers.

19. The MSAAC Policies also contain the following endorsement:

**FUNGI OR BACTERIA EXCLUSION (LIABILITY)**

This endorsement modifies the insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

The following provisions are added to **Section II – Liability:**

**A.** The following exclusion is added to Paragraph **B.1, Exclusions – Applicable To Business Liability Coverage:**

**t. Fungi Or Bacteria**

**(1)** "Bodily injury", "property damage" or "personal and advertising injury" which would not have occurred, in whole or in part, but for the actual, alleged, or threatened inhalation of, ingestion of, contact with, exposure to, existence of, or presence of, any "fungi" or bacteria on or within a building or structure, including its contents, regardless of whether any other cause, event, material or product contributed concurrently or in any sequence to such injury or damage.

**(2)** Any loss, cost or expenses arising out of the abating, testing for, monitoring, cleaning up, removing, containing, treating, detoxifying, neutralizing, remediating or disposing of, or in any way responding to, or assessing the effects of, "fungi" or bacteria, by any insured or by any other person or entity.

This exclusion does not apply to any "fungi" or bacteria that are, are on, or are contained in, a good or product intended for bodily consumption.

**B.** The following definition is added [to] Paragraph **F. Liability And Medical Expenses Definitions:**

**1.** "Fungi" means any type or form of fungus, including mold or mildew and any mycotoxins, spores, scents or by-products produced or released by fungi.

20. Additionally, the MSAAC Policies contain the following endorsement:

**EXCLUSION – EXTERIOR INSULATION AND FINISH SYSTEMS**

This endorsement modifies insurance provided under the following:

BUSINESSOWNERS COVERAGE FORM

**Section II – Liability** is amended as follows:

**A.** This insurance does not apply to "bodily injury", "property damage" or "personal and advertising injury" arising out of, caused by, or attributable to, whether in whole or in part, the following:

**1.** The design, manufacture, construction, fabrication, preparation, distribution and sale, installation, application, maintenance or repair, including remodeling, service, correction or replacement, of any "exterior insulation and finish system" or any part thereof, or any substantially similar system or any part thereof, including the application or use of conditioners, primers, accessories, flashings, coatings, caulking or sealants in connection with such a system; or

**2.** "Your product" or "your work" with respect to any exterior component, fixture or feature of any structure if an "exterior insulation and finish system," or any substantially similar system, is used on the part of that structure containing that component, fixture or feature.

**B.** The following definition is added to the **Definitions** Section:

"Exterior insulation and finish system" means a non-load bearing exterior cladding or finish system, and all component parts therein, used on any part of any structure, and consisting of:

**1.** A rigid or semi-rigid insulation board made of expanded polystyrene and other materials;

**2.** The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate;

**3.** A reinforced or unreinforced base coat;

**4.** A finish coat providing surface texture to which color may be added; and

**5.** Any flashing, caulking or sealant used with the system for any purpose.

21. With respect to additional insured coverage, the MSAAC Policies include Contractors Extension Endorsement BPM 3105 1207, which amends the Coverage Form as follows:

> **A. Additional Insureds**
>
> Each of the following is added to Paragraph **C. Who Is An Insured of BPM P 2 – Section II – Liability** but only as specifically described by the following:
>
> **1.** Any person(s) or organization(s) for whom you are performing operations is also an additional insured, when you and such person or organization have agreed in writing in a contract or agreement that such person or organization be added as an additional insured on your policy. Such person or organization is an additional insured only with respect to liability for "bodily injury", "property damage", [and] "personal and advertising injury" caused in whole or part, by:
>
> **a.** Your acts or omissions; or
>
> **b.** The acts or omissions of those acting on your behalf;
>
> In the performance of your ongoing operations or "your work" included within the "products-completed operations" hazard for the additional insured at the location designated and described in the written contract or agreement. . . .

22. There are other terms, conditions, definitions, provisions, limitations, exclusions, and endorsements in the MSAAC Policies that may be implicated in this matter besides those set forth in this Complaint, and MSAAC incorporates those other terms, conditions, definitions, provisions, limitations, exclusions, and endorsements into this Complaint by reference as if fully set forth herein.

**B. <u>The Subcontract</u>**

23. In support of its demand for additional insured coverage, W.B. Homes provided a copy of an "Agreement Between Contractor and Subcontractor" between Howard Lynch and

W.B. Homes dated March 19, 2008 (the "Subcontract"). A copy of the Subcontract is attached as **Exhibit D**.

24. The Subcontract contains a provision, entitled "Subcontractor's Liability Insurance," which provides, in relevant part:

> a) Prior to starting work, the Subcontractor shall obtain insurance in the minimum amounts shown below from a company that has a rating of ("A-VIII") or better from the A.M. Best Rating Company:
>
> 1. Minimum acceptable limits of insurance from the Subcontractors are as follows:
>
> | Commercial General Liability – Occurrence Form | |
> |---|---|
> | General Aggregate | $2,000,000 (Per Project) |
> | Products/Completed Operations | $1,000,000 |
> | Each Occurrence | $1,000,000 |
> | Personal Advertising Injury | $1,000,000 |
> | Fire Damage | $ 50,000 |
> | Medical Expense | $ 5,000 |
>
> Coverage should comply with standard ISO forms including but not limited to:
>
> - Independent Contractors Liability
> - Products/Completed Operations Liability
> - Contractual Liability
> - Explosion, Collapse and Underground Coverage
>
> * * *
>
> b) Prior to starting work the Subcontractor shall supply to Contractor/Contractor Entity an Insurance Certificate that includes the following:
>
> * * *
>
> 2. Certificate shall list Contractor and all of its [sic] Officers, Directors, Subsidiaries and all other related, affiliated and created Entities including but not limited to General partnerships, Limited Partnerships, Limited Liability Corporations, and Corporations as additional insured on the General Liability as respects to [sic] operations of the subcontractor. . . .

25. The Subcontract also contains a provision entitled "The 'Work' and the 'Contract Sum,'" which states, in relevant part:

> Either as an Exhibit to this Agreement or by Addendum(s) to this Agreement, Contractor shall provide to Subcontractor specific contract sums for work to be performed that Subcontractor and Contractor have agreed to for a specific project or multiple projects as determined by Contractor. Either as part of this Agreement, or subsequent Addendums, or by separate correspondence, Contractor shall provide to Subcontractor specific job specifications, and scope of work that all contract sums are based upon. Subcontractor shall perform all work and furnish all material as more particularly described in these specifications and scope of work.

26. The Subcontract does not refer to a specific project, neighborhood, or home, and W.B. Homes has not provided MSAAC evidence to tie the Subcontract to the work Howard Lynch allegedly performed on the Homes.

**C. <u>The Demands for Coverage</u>**

27. On January 31, 2020, MSAAC received email correspondence from USI Insurance Services, LLC ("USI"), the insurance agent for W.B. Homes, which informed MSAAC that W.B. Homes was seeking additional insured coverage for reimbursement of "significant expense" incurred by W.B. Homes to "repair property damage as a result of operations performed on several private residences by Howard Lynch," including the home at issue in the McGinnis Lawsuit ("McGinnis Home"), the Claims, and the Desnoyers Arbitration.

28. Upon receipt of the January 31, 2020 correspondence, MSAAC began to investigate the Claims and the Legal Proceedings. To this end, MSAAC made a request for information it needed to make its coverage determination as to whether there was coverage afforded to Howard Lynch under the MSAAC Policies in connection with the Claims and the Legal Proceedings. Howard Lynch did not provide a response to MSAAC's request, nor did it

seek or tender its defense in connection with the Claims, the Desnoyers Arbitration, or the McGinnis Lawsuit.

29. On April 14, 2020, MSAAC learned that the McGinnis Home was the subject of the McGinnis Lawsuit when it received notice of the Lawsuit through correspondence from W.B. Homes' direct insurer, Nationwide Insurance Company ("Nationwide").

30. On August 14, 2020, Howard Lynch was served with a Complaint to Join Additional Defendants (the "Joinder Complaint") filed by W.B. Homes and its affiliated entities.

31. MSAAC was advised that no counsel had entered an appearance on behalf of Howard Lynch in the McGinnis Lawsuit.

32. MSAAC did a preliminary evaluation of the allegations of the McGinnis Complaint and, in light of the fact that Howard Lynch did not have counsel in the McGinnis Lawsuit and in an abundance of caution, agreed to defend Howard Lynch against the McGinnis Lawsuit pursuant to a reservation of rights and retained defense counsel.

33. Thereafter, MSAAC completed its coverage evaluation and determined that there was no coverage afforded to Howard Lynch for the claims asserted against it in the McGinnis Lawsuit.

34. Accordingly, MSAAC informed Howard Lynch that it would be withdrawing its defense and that it would provide Howard Lynch with adequate time to retain new counsel.

35. MSAAC sought Howard Lynch's cooperation both in the investigation of the claims asserted against it in the McGinnis Lawsuit and with respect to its withdrawal of its defense; however, it heard nothing from Howard Lynch.

36. Unbeknownst to MSAAC until sometime in mid-February of 2021, Howard Lee Lynch, Sr., the president of Howard Lynch, passed away in December of 2020. In light of the

circumstances, MSAAC decided not to withdraw from the defense, but instead seek a determination from this Court that it has no obligation to defend, indemnify, or reimburse Howard Lynch (or W.B. Homes) in connection with the McGinnis Lawsuit.

37. MSAAC also made specific requests for the information it needed to make its coverage determination as to whether W.B. Homes is an additional insured under the MSAAC Policies and as to whether there was coverage afforded to it under the MSAAC Policies in connection with the Claims and the Legal Proceedings. W.B. Homes did not specifically seek or tender a defense as an additional insured in connection with either the Claims or the Legal Proceedings; it only sought reimbursement for the costs that it contends it incurred to remediate the Homes. After further communications between MSAAC and W.B. Homes with regard to the information MSAAC needed to evaluate W.B. Homes' request for additional insured coverage, W.B. Homes provided additional information and later confirmed on or about June 25, 2021, that MSAAC had all of the information that was responsive to MSAAC's requests.

**D. The McGinnis Lawsuit**

38. On July 31, 2018, the McGinnises commenced the McGinnis Lawsuit against W.B. Homes and several of its affiliated entities: Penn Gwyn, L.P. ("Penn Gwyn"), Thornby Development Corp. ("Thornby"), W.B. Homes Development Co., Inc., and William J. Bonenberger a/k/a William J. Bonnenberger ("Bonenberger"). A copy of the complaint filed in the McGinnis Lawsuit is attached as **Exhibit E** ("McGinnis Complaint").

39. The McGinnis Complaint alleges that:

a. On October 12, 2003, the McGinnises entered into an Agreement of Sale with W.B. Homes for the purchase of the home located at 2573 Muirfield Lane, Lansdale, Pennsylvania (the "Home").

b. A Certificate of Occupancy for the Home was issued on or about November 12, 2004, and the McGinnises allegedly took possession of the Home on or about November 19, 2004.

c. "In or around the early part of 2018," the McGinnises "considered selling their Home" and "[b]ecause of stucco issues in neighboring developments, [they] decided to have a stucco evaluation performed." The McGinnises hired Rob Lunny from Lunny Building Diagnostics ("Lunny") to perform a Building Moisture Survey of the Home. Lunny performed the inspection on March 23, 2018, and prepared a report. According to the McGinnises, Lunny's inspection allegedly revealed "numerous construction defects with respect to the Home," including, but not limited to: "[i]nadequate or missing flashing around windows, doors and penetrations of the building envelope"; "[g]aps in [s]ills"; "[e]xposed wood under right and left side of front patio"; "[a] provision for drainage or 'weep screed' was not installed"; "[i]nadequate kickout flashing in roof/wall intersections"; "[c]ontrol joints were not installed at floor lines"; "[i]nadequate window head flashing"; "[c]asing beads not installed around windows and doors"; "[s]ystem extends over foundation"; "[l]ack of flashing detail at stone/stucco intersections"; "[l]ack of drainage in FD stone system"; and "[l]ack of sealing around light fixture attachments." The inspection also allegedly revealed "the following damage . . . as a direct and proximate cause of the above-referenced construction defects": "[f]ailed substrate"; "[e]levated moisture readings"; "[a]reas of no resistance of the sheathing"; and "[m]oisture damage to windows and doors."

d. Based on such allegations, on May 7, 2020, W.B. Homes, Bonenberger, and Penn Gwyn filed the Joinder Complaint alleging that they were the general contractor entities responsible for construction of the Home and that they subcontracted with the additional

defendants, Howard Lynch and Antonio Coletta, LLC. A copy of the Joinder Complaint is attached as **Exhibit F**.

e. In the McGinnis Lawsuit, the McGinnises demanded remediation and repair, including removal and replacement of stucco and flashing, that is estimated to cost in excess of $150,000, in addition to other damages caused by the defective construction, including diminution in value of the Home, as well as engineering fees, consultant fees, and legal fees.

**E. The Claims**

40. The information provided to date by W.B. Homes to MSAAC in connection with the Claims establishes that W.B. Homes constructed the Homes throughout the 2000s and into the early 2010s and that many of the homeowners subsequently notified W.B. Homes of alleged defects and damages to their Homes. Many of the homeowners hired inspection companies to perform inspections on their Homes and provided W.B. Homes with those inspection reports. The reports contain information concerning when alleged property damage from the allegedly defective construction of the stucco (Howard Lynch's scope of work) became reasonably apparent to the homeowners and identify a number of construction defects, including defects with the stucco exterior cladding systems, and damages to the Homes as a result of these defects. Based on the information provided to MSAAC by W.B. Homes, it appears that W.B. Homes made repairs to many of the Homes between 2011 and 2019.

**F. The Desnoyers Arbitration**

41. On November 30, 2015, the Desnoyers commenced a private arbitration action against W.B. Homes. A copy of the complaint filed in the Desnoyers Arbitration is attached as **Exhibit G** ("Desnoyers Complaint").

42. The Desnoyers Complaint alleges that:

a. On December 20, 2009, the Desnoyers entered into an Agreement of Sale with W.B. Homes for the purchase of a single-family home to be constructed at 592 Oakmont Drive West, Telford, Pennsylvania (the "Desnoyers Home").

b. The Desnoyers closed on the Home on or about August 2, 2010.

c. "In the spring of 2014," the Desnoyers contacted W.B. Homes "to report problems of water and moisture intrusion through the stucco exterior of the Home." The Desnoyers hired Frank Hendron from Northeast Inspection Corporation ("NIC") to perform a Hardcoat Stucco Assessment and a Moisture Intrusion Evaluation. NIC performed the inspection on May 17, 2014, and prepared a report. According to the Desnoyers, NIC's inspection allegedly revealed "significant construction defects, including, without limitation: [i]nadequate or non-existent caulking around windows and doors; [i]nadequate or non-existent installation of flashing around windows and doors; [i]nadequate or non-existent joints between stucco and other exterior building materials; [i]mproper termination of stucco below grade; [i]mproper installation or placement of weep screeds; and [i]nadequate thickness of stucco and improper attachment of wire lath to framing." The Desnoyers further alleged that "[t]hese defects are material because, among other things, they allow water to penetrate the exterior of the Home, where it becomes trapped within the wall systems, causing rotting and deterioration of the substrate and framing, as well as mold." According to the Desnoyers, "the NIC report revealed elevated moisture readings at a number of sampled locations, strongly indicating the presence of hidden damage."

d. The Desnoyers Complaint also alleges that W.B. Homes "engaged the services of Craig Tillman of Tillman Inspections, LLC to perform further moisture testing through additional probes," and that although "[t]he report generated by Tillman confirmed many

of the elevated moisture levels from the NIC report," Tillman "opined that no significant remediation was necessary." Accordingly, W.B. Homes "refused to perform any remediation" on the Desnoyers Home. Additionally, despite initially agreeing to "pay for and perform forensic work under Mr. Hendron's direction," W.B. Homes later advised the Desnoyers that it "was no longer willing to pay for and perform the requested forensic work on the Home."

e. As a result of W.B. Homes' refusal to pay for and perform the forensic work, the Desnoyers proceeded, at their own expense, with forensic testing on their Home on June 12, 2015. The Desnoyers allege that the testing "confirmed water intrusion on all elevations of the Home."

f. In the Desnoyers Arbitration, the Desnoyers alleged that they needed "to take steps to remediate their Home to avoid further damage caused by the water infiltration, including, but not limited to, removal and replacement of the damaged sheathing, installation of appropriate flashings, remediation of the stucco system, and the remediation of the mold and bacterial contamination." The Desnoyers estimated that the total cost of remediation would exceed $100,000. Accordingly, the Desnoyers demanded judgment against W.B. Homes in an amount in excess of $100,000, together with costs, interest, and counsel fees.

43. W.B. Homes and the Desnoyers subsequently engaged in arbitration on or about November 28, 2018, and resolved the matter through settlement.

## G. Bases for Declarations Sought By MSAAC

### 1. Howard Lynch

44. MSAAC has no duty to defend, indemnify, or reimburse Howard Lynch because the homeowners' Claims and the claims in the Legal Proceedings do not allege damages because

of "property damage" caused by an "occurrence," as those terms are defined under the MSAAC Policies.

45. MSAAC has no duty to defend, indemnify, or reimburse Howard Lynch because the contractual indemnity exclusion, the business risk exclusions, the Fungi or Bacteria Exclusion, and the Exterior Insulation and Finish Systems Exclusion contained in the MSAAC Policies also preclude or limit coverage for Howard Lynch in connection with the Claims and the Legal Proceedings.

46. MSAAC has no duty to defend, indemnify, or reimburse Howard Lynch in connection with the Claims and the Legal Proceedings because Howard Lynch did not seek or tender a defense in connection with the Claims and the Legal Proceedings.

47. MSAAC has no duty to defend, indemnify, or reimburse Howard Lynch in connection with the McGinnis Lawsuit because Howard Lynch failed to cooperate both in the investigation of the claims asserted against it in the McGinnis Lawsuit and with respect to the withdrawal of its defense. MSAAC also has no duty to defend, indemnify, or reimburse Howard Lynch in connection with the Claims or the Desnoyers Arbitration because Howard Lynch breached the general liability conditions in the MSAAC Policies, particularly, the conditions regarding notice and cooperation, by failing to provide MSAAC with any information concerning the Claims or the Desnoyers Arbitration upon MSAAC's request.

48. To the extent that there is other insurance covering Howard Lynch in connection with the Claims and the Legal Proceedings, the Other Insurance Provision would render MSAAC's Policies excess and would be yet another basis for MSAAC's determination that Howard Lynch is not entitled to coverage for the Claims and the Legal Proceedings under the Policies.

49. Additionally, as to the 18 Homes referenced in the chart below, the information provided by W.B. Homes to MSAAC to date demonstrates that none of the alleged property damage was reasonably apparent within MSAAC's policy periods. Accordingly, MSAAC has no duty to defend, indemnify, or reimburse Howard Lynch in connection with the following Homes because the alleged property damage did not occur during the policy period of any of the MSAAC Policies:

| Home | Manifestation Date |
|---|---|
| The Humphrey Home | 7/24/2015 |
| The Faikish Home | 4/19/2017 |
| The Leone Home | 12/21/2015 |
| The Davidar Home | 9/18/2018 |
| The DiFilippo Home | 11/10/2016 |
| The O'Flynn Home | 6/30/2017 |
| The Manley Home | 12/1/2016 |
| The Bhalla Home | 10/28/2019 (first inspection)<br>11/25/2019 (second inspection) |
| The Rocco Home | 4/8/2017 |
| The DePermentier Home | 6/1/2016 |
| The Hahn Home | 9/14/2016 |
| The Steck Home | 6/13/2016 |
| The Klaskin Home | 10/3/2010 |
| The Devlin Home | 8/26/2017 |
| The Harbaugh Home | 1/28/2016 (visual and thermal inspection)<br>2/1/2016 (probing) |
| The Blair Home | 3/23/2017 |
| The Pisoni Home | 2/27/2017 |
| The McGinnis Home | 3/23/2018 |

50. Finally, MSAAC has no duty to defend, indemnify, or reimburse Howard Lynch in connection with the Claims because the Claims are not "suits," as that term is defined in the MSAAC Policies.

**2. W.B. Homes**

51. MSAAC has no obligation to defend, indemnify, or reimburse W.B. Homes as an additional insured because W.B. Homes has failed to demonstrate that it qualifies as an additional insured under the MSAAC Policies.

52. MSAAC has no duty to defend, indemnify, or reimburse W.B. Homes because the homeowners' Claims and the claims in the Legal Proceedings against W.B. Homes do not allege damages because of "property damage" caused by an "occurrence," as those terms are defined under the MSAAC Policies.

53. MSAAC also has no duty to defend, indemnify, or reimburse W.B. Homes or Howard Lynch because the business risk exclusions, the Fungi or Bacteria Exclusion, and the Exterior Insulation and Finish Systems Exclusion contained in the MSAAC Policies preclude or limit coverage for W.B. Homes in connection with the Claims and the Legal Proceedings.

54. MSAAC also has no duty to defend, indemnify, or reimburse W.B. Homes because W.B. Homes did not seek or tender a defense as an additional insured in connection with the Claims and the Legal Proceedings.

55. MSAAC has no duty to defend, indemnify, or reimburse W.B. Homes in connection with the Claims and the Legal Proceedings because W.B. Homes breached the general liability conditions in the MSAAC Policies, particularly, the conditions regarding notice, cooperation, and voluntary payments:

a. To the extent that W.B. Homes were to qualify as an additional insured under the MSAAC Policies, it would have had an obligation to cooperate with MSAAC pursuant to the general liability conditions contained in the MSAAC Policies, including a duty to immediately send to MSAAC copies of any demands, notices, summonses, or legal papers received in connection with the Claims and the Legal Proceedings, including demands for

remediation and repairs. According to the information provided by W.B. Homes to MSAAC in connection with the Claims to date, many of the homeowners made demands on W.B. Homes for remediation and repairs throughout the 2010s. Similarly, according to the information provided by W.B. Homes to MSAAC in connection with the Desnoyers Arbitration to date, the Desnoyers filed their arbitration complaint on November 30, 2015, and the matter was resolved through settlement on or about November 28, 2018. And finally, according to the information provided by W.B. Homes to MSAAC in connection with the McGinnis Lawsuit to date, the McGinnises commenced the Lawsuit on July 31, 2018. However, MSAAC did not receive notice of any of the Claims or the Legal Proceedings until January 31, 2020, when W.B. Homes' insurance agent sent correspondence to MSAAC demanding additional insured coverage.

b. To the extent that W.B. Homes were to qualify as an additional insured, it also would have had a duty to cooperate with MSAAC pursuant to the general liability conditions contained in the MSAAC Policies in connection with the investigation and settlement of the Claims and the Desnoyers Arbitration, but failed to do so in that it did not provide the information requested by MSAAC in a timely fashion.

c. The general liability conditions also expressly prohibited W.B. Homes from "voluntarily mak[ing] a payment, assum[ing] any obligation, or incur[ring] any expense . . . without [MSAAC's] consent." However, W.B. Homes voluntarily made repairs to many of the Homes and settled the Desnoyers Arbitration. W.B. Homes allegedly "incurred significant expense" to do so, all without MSAAC's knowledge or consent.

56. To the extent that W.B. Homes were to qualify as an additional insured under the MSAAC Policies and there is other insurance covering W.B. Homes' claims for additional insured coverage, the Other Insurance Provision would render MSAAC's Policies excess and

would be yet another basis for MSAAC's determination that W.B. Homes is not entitled to coverage for the Claims or Legal Proceedings under the Policies.

57. Additionally, as to the 18 Homes referenced in the chart below, the information provided by W.B. Homes to MSAAC to date demonstrates that none of the alleged property damage was reasonably apparent within MSAAC's policy periods. Accordingly, MSAAC has no duty to defend, indemnify, or reimburse W.B. Homes in connection with the following Homes because the alleged property damage did not occur during the policy period of any of the MSAAC Policies:

| Home | Manifestation Date |
|---|---|
| The Humphrey Home | 7/24/2015 |
| The Faikish Home | 4/19/2017 |
| The Leone Home | 12/21/2015 |
| The Davidar Home | 9/18/2018 |
| The DiFilippo Home | 11/10/2016 |
| The O'Flynn Home | 6/30/2017 |
| The Manley Home | 12/1/2016 |
| The Bhalla Home | 10/28/2019 (first inspection)<br>11/25/2019 (second inspection) |
| The Rocco Home | 4/8/2017 |
| The DePermentier Home | 6/1/2016 |
| The Hahn Home | 9/14/2016 |
| The Steck Home | 6/13/2016 |
| The Klaskin Home | 10/3/2010 |
| The Devlin Home | 8/26/2017 |
| The Harbaugh Home | 1/28/2016 (visual and thermal inspection)<br>2/1/2016 (probing) |
| The Blair Home | 3/23/2017 |
| The Pisoni Home | 2/27/2017 |
| The McGinnis Home | 3/23/2018 |

58. Finally, MSAAC has no duty to defend, indemnify, or reimburse W.B. Homes in connection with the Claims because the Claims are not "suits," as that term is defined in the MSAAC Policies.

**COUNT I**
**(Declaratory Judgment—MSAAC Has No Duty to Defend, Indemnify, or Reimburse Howard Lynch)**

59. MSAAC repeats and incorporates the foregoing allegations as if set forth more fully herein.

60. The homeowners' Claims and the claims in the Legal Proceedings are not covered by the MSAAC Policies because they are not claims for damages because of "property damage" caused by an "occurrence," as those terms are defined under the Policies.

61. Moreover, the contractual indemnity exclusion precludes coverage for the Claims and the Legal Proceedings, and there is no coverage for the cost to repair or replace Howard Lynch's own work or property that was damaged because Howard Lynch's work was incorrectly performed on it, or costs related to mold testing and remediation, all of which are excluded from coverage by the business risk exclusions, the Fungi or Bacteria Exclusion, and the Exterior Insulation and Finish Systems Exclusion.

62. Howard Lynch did not seek or tender a defense or reimbursement for defense fees and costs in connection with the Claims and the Legal Proceedings.

63. Howard Lynch has breached the general liability conditions in the MSAAC Policies by failing to cooperate both in the investigation of the claims asserted against it in the McGinnis Lawsuit and with respect to the withdrawal of its defense and failing to provide MSAAC with any information concerning the Claims or the Desnoyers Arbitration upon MSAAC's request. MSAAC has been and will be prejudiced by these breaches.

64. To the extent that there is other insurance covering Howard Lynch in connection with the Claims and the Legal Proceedings, the Other Insurance Provision would render MSAAC's Policies excess to any such insurance.

65. The Claims regarding the Humphrey Home, the Faikish Home, the Leone Home, the Davidar Home, the DiFilippo Home, the O'Flynn Home, the Manley Home, the Bhalla Home, the Rocco Home, the DePermentier Home, the Hahn Home, the Steck Home, the Klaskin Home, the Devlin Home, the Harbaugh Home, the Blair Home, and the Pisoni Home and the claims made in the McGinnis Lawsuit are not covered by the MSAAC Policies because they are not claims for "property damage" that occurred during the policy period of any of the MSAAC Policies.

66. The Claims are not covered by the MSAAC Policies because they are not "suits," as that term is defined in the MSAAC Policies.

67. MSAAC is not obligated under the MSAAC Policies to defend, indemnify, or reimburse Howard Lynch in connection with the Claims and the Legal Proceedings.

68. MSAAC is entitled withdraw its defense of Howard Lynch in the McGinnis Lawsuit.

69. Whether MSAAC is obligated to defend, indemnify, or reimburse Howard Lynch in connection with the Claims and the Legal Proceedings for all the reasons stated is the subject of dispute between MSAAC and Howard Lynch.

**COUNT II**
**(Declaratory Judgment—MSAAC Has No Duty To Defend, Indemnify, or Reimburse W.B. Homes)**

70. MSAAC repeats and incorporates the foregoing allegations as if set forth fully herein.

71. W.B. Homes does not qualify as an additional insured under the MSAAC Policies for the Claims and the Legal Proceedings.

72. Additionally, the homeowners' Claims and the claims in the Legal Proceedings are not covered by the MSAAC Policies because they are not claims for damages because of "property damage" caused by an "occurrence," as those terms are defined under the Policies.

73. Moreover, there is no coverage for the cost to repair or replace Howard Lynch's own work or property that was damaged because Howard Lynch's work was incorrectly performed on it, or costs related to mold testing and remediation, all of which are excluded from coverage by the business risk exclusions, the Fungi or Bacteria Exclusion, and the Exterior Insulation and Finish Systems Exclusion.

74. W.B. Homes did not seek or tender a defense or reimbursement for defense fees and costs as an additional insured in connection with the Claims and the Legal Proceedings.

75. W.B. Homes also breached the general liability conditions in the MSAAC Policies, particularly, the conditions regarding notice, cooperation, and voluntary payments, and MSAAC has been and continues to be prejudiced by these breaches.

76. To the extent that there is other insurance covering W.B. Homes' claims for additional insured coverage under the Policies in connection with the Claims and the Legal Proceedings, the Other Insurance Provision would render MSAAC's Policies excess to any such insurance.

77. The Claims regarding the Humphrey Home, the Faikish Home, the Leone Home, the Davidar Home, the DiFilippo Home, the O'Flynn Home, the Manley Home, the Bhalla Home, the Rocco Home, the DePermentier Home, the Hahn Home, the Steck Home, the Klaskin Home, the Devlin Home, the Harbaugh Home, the Blair Home, and the Pisoni Home and the claims made in the McGinnis Lawsuit are not covered by the MSAAC Policies because they are

not claims for "property damage" that occurred during the policy period of any of the MSAAC Policies.

78. The Claims are not covered by the MSAAC Policies because they are not "suits," as that term is defined in the MSAAC Policies.

79. MSAAC is not obligated under the MSAAC Policies to defend, indemnify, or reimburse W.B. Homes in connection with the Claims and the Legal Proceedings.

80. Whether W.B. Homes qualifies as an additional insured under the MSAAC Policies and whether MSAAC is obligated to defend, indemnify, or reimburse W.B. Homes in connection with the Claims and the Legal Proceedings for all the reasons stated is the subject of dispute between MSAAC and W.B. Homes.

WHEREFORE, MSAAC requests that this Court enter judgment declaring:

A. That MSAAC is not obligated under the MSAAC Policies to defend, indemnify, or reimburse Howard Lynch in connection with the Claims and the Legal Proceedings;

B. That MSAAC is entitled to withdraw its defense of Howard Lynch in the McGinnis Lawsuit;

C. That W.B. Homes is not an additional insured under the MSAAC Policies for the Claims and the Legal Proceedings;

D. That MSAAC is not obligated under the MSAAC Policies to defend, indemnify, or reimburse W.B. Homes in connection with the Claims and the Legal Proceedings; and

E. That MSAAC is entitled to such other relief as this Court deems just and proper.

Dated: September 7, 2021

Respectfully submitted,

*/s/ Richard J. Orr*

Richard J. Orr (Fed. Bar No. 66860)
Dilworth Paxson, LLP
2 Research Way
Princeton, New Jersey 08540
Telephone: 609-987-3393
Facsimile: 609-651-3616
rorr@dilworthlaw.com

Susan M. Hogan*
Joseph Dudek*
Kramon & Graham, P.A.
One South Street, Suite 2600
Baltimore, Maryland 21202-3201
Telephone: 410-752-6030
Facsimile: 410-539-1269
shogan@kg-law.com
jdudek@kg-law.com

*Attorneys for Plaintiff, Main Street America Assurance Company*

* Motion for admission *pro hac vice* forthcoming