# EXHIBIT G

Stuart D. Lurie (I.D. No. 83391)
ROSENTHAL LURIE LLC
486 Thomas Jones Way, Suite 210
Exton, PA 19341
(484) 693-0788 – Tel.
(215) 600-1728 – Fax
Stuart@RosenthalLurie.com
*Attorney for Claimants*

| | |
|---|---|
| RODWIGE and CAMILLE DESNOYERS<br>592 Oakmont Dr. West<br>Telford, PA 18969<br><br><div align="center">Claimants,</div>     v.<br><br>W.B. HOMES, INC.<br>404 Sumneytown Pike, Suite 200<br>North Wales, PA 19454<br><br><div align="center">Respondent.</div> | PRIVATE ARBITRATION |

## COMPLAINT

Claimants, Rodwige and Camille Desnoyers ("Claimants" or the "Desnoyers"), husband and wife, by and through their undersigned counsel, hereby file this Complaint against Respondent, W.B. Homes, Inc. ("Respondent" or "WB"), and, in support thereof, aver the following:

## PARTIES

1.      Claimants are adult individuals residing at 592 Oakmont Dr. West, Telford, PA 18969.

2.      Respondent is a Pennsylvania corporation with a business address at 404 Sumneytown Pike, Suite 200, North Wales, PA 19454.

## RELEVANT BACKGROUND

3.      On December 20, 2009, Claimants entered into an Agreement of Sale (the "Agreement of Sale") with WB to purchase a to-be-constructed single-family home located at

592 Oakmont Dr. West, Telford, PA 18969 (the "Home") for the sum of $771,645.00.  A true and correct copy of an unsigned version of the Agreement of Sale is attached hereto as Exhibit 1. It is believed that Defendant possesses a copy of the complete, final, fully executed agreement of sale.

4.      Closing occurred on or about August 2, 2010.

**Plaintiffs Discover Construction Defects**

5.      In the spring of 2014, Claimants contacted WB to report problems of water and moisture intrusion through the stucco exterior of the Home.

6.      The problems were detailed in a written Moisture Intrusion Evaluation Report from Frank Hendron of Northeast Inspection Corporation ("NIC"), a copy of which was provided to WB.  The NIC report revealed significant construction defects, including, without limitation:

- Inadequate or non-existent caulking around windows and doors;
- Inadequate or non-existent installation of flashing around windows and doors;
- Inadequate or non-existent joints between stucco and other exterior building materials;
- Improper termination of stucco below grade;
- Improper installation or placement of weep screeds; and
- Inadequate thickness of stucco and improper attachment of wire lath to framing.

7.      These defects are material because, among other things, they allow water to penetrate the exterior of the Home, where it becomes trapped within the wall systems, causing rotting and deterioration of the substrate and framing, as well as mold.  Indeed, the NIC report revealed elevated moisture readings at a number of sampled locations, strongly indicating the presence of hidden damage.

8.      In response to the NIC report, WB engaged the services of Craig Tillman of Tillman Inspections, LLC to perform further moisture testing through additional probes.  The

2

report generated by Tillman confirmed many of the elevated moisture levels from the NIC report.

9.      Despite these elevated readings, however, Tillman opined that no significant remediation was necessary.  Seemingly on the strength of the Tillman report, WB refused to perform any remediation.

10.     Counsel for Claimants wrote to WB's Vice President of Operations, Jack Boyd, on October 16, 2014, asking WB to re-consider its prior refusal, and instead agree to perform certain forensic testing to reconcile the differing opinions of Messrs. Hendron and Tillman.  A true and correct copy of counsel's letter is attached hereto as Exhibit 2.

11.     On January 19, 2015, a conference call occurred involving Mr. Boyd, Mr. Hendron, and counsel for Claimants.  During that call, Mr. Boyd agreed that WB would pay for and perform forensic work under Mr. Hendron's direction.  Counsel for Claimants followed up with a confirming letter on January 21, 2015.  A true and correct copy of counsel's letter is attached hereto as Exhibit 3.

12.     On February 5, 2015, Mr. Boyd wrote to counsel for Claimants, advising that WB was no longer willing to pay for and perform the requested forensic work on the Home.  A true and correct copy of WB's letter is attached hereto as Exhibit 4.

13.     With WB having disavowed its prior agreement to pay for and perform the forensic work, Claimants proceeded with the forensics on their own.  The forensic testing occurred on June 12, 2015, and confirmed water intrusion on all elevations of the Home.

14.     Claimants must take steps to remediate their Home to avoid further damage caused by the water infiltration, including, but not limited to, removal and replacement of the

3

damaged sheathing, installation of appropriate flashings, remediation of the stucco system, and the remediation of the mold and bacterial contamination.

15.     It is estimated that the total cost of remediation will exceed $100,000. Remediation includes, without limitation, a full removal and re-cladding of the Home's stucco and stone exterior, as well as the replacement of windows and doors, and mold remediation.

**COUNT I**
**Negligence**

16.     Claimants incorporate the previous paragraphs as though set forth at length herein.

17.     Respondent owed Claimants a duty to construct the Home in a workmanlike manner with reasonable care and skill and free from material defects.

18.     Respondent breached its duty by failing to act as a reasonable and competent contractor in, among other things, using defective materials and/or failing to properly install flashing at areas of the Home, failing to properly install the stone and stucco exterior systems, and failing to properly flash and install windows and doors.

19.     The construction of the Home failed to meet the plans and specifications, applicable building codes, industry standards, and/or, in the alternative, the applicable manufacturers' recommendations.

20.     Respondent also had a duty, upon notice of any defects at the Home, to inspect the Home and to advise Claimants of same and to properly remediate the defects and resultant damage.

21.     Respondent breached this duty toward Claimants by concealing and/or failing to advise Claimants of defects in their Home, even though Respondent had knowledge of same, by

falsely representing the nature and/or cause of the defective condition and by failing to correct and remediate those defects.

22.     As a direct and proximate result of the aforesaid negligence of Respondent, and/or its agents, workers, or employees, Claimants sustained physical damage to their Home, and will incur substantial expenses associated therewith, including, without limitation, repair and replacement costs to correct the deficiencies and resultant damage, consulting and professional engineering and testing, payment of property taxes and mortgage interest, loss of utility of the residence and inconvenience.

WHEREFORE, Claimants demand judgment against Respondent in an amount in excess of $100,000, together with costs, interest, and any other relief that the Arbitrator deems just and appropriate.

## COUNT II
### Breach of Contract/Breach of Express Warranty

23.     Claimants incorporate the previous paragraphs as though set forth at length herein.

24.     The Agreement of Sale and accompanying Warranty provided that Claimants' Home would be free from defects in workmanship and materials.

25.     Respondent breached the Agreement of Sale and Warranty by failing to construct a Home free from defects, as discussed above.

26.     Respondent also breached the Agreement of Sale and Warranty by failing to properly remediate and repair the defective conditions at Claimants; Home after it was provided with notice of same.

5

27.     Upon information and belief, Claimants' Home has suffered water damage and bacterial growth, all of which could have been prevented had the proper work been performed by Respondent.

28.     As a direct and proximate result of the aforesaid breaches of the Agreement of Sale and Warranty, Claimants have sustained damage to their Home, and incurred substantial expenses associated therewith, as set forth throughout this Complaint.

WHEREFORE, Claimants demand judgment against Respondent in an amount in excess of $100,000, together with costs, interest, counsel fees, and any other relief that the Arbitrator deems just and appropriate.

**COUNT III**
**Breach of Implied Warranty of Habitability and Workmanlike Construction**

29.     Claimants incorporate the previous paragraphs as though set forth at length herein.

30.     At all times relevant, the Home delivered by Respondent was subject, under Pennsylvania law, to an implied warranty of habitability and an implied warranty of reasonable workmanship, in which Respondent warranted that Claimants' Home would be reasonably constructed to community standards, free from defects and code violations and/or habitable, and that they would repair or replace any defective items or pay Claimants the cost of repairing or replacing same.

31.     The Home delivered by Respondent contained building defects, code violations, and was not constructed using reasonable workmanship.

32.     The habitability of the dwelling has been significantly impaired by the conditions and defects in the dwelling, including, but not limited to, water intrusion, which has materially affected Claimants' ability to use the Home.

6

33.     Respondent breached its  implied warranties of workmanship by failing to incorporate and use materials that were free from defects, and/or to construct a Home free from defects and code violations and that failed to follow manufacturer's guidelines and instructions and/or community standards.

34.     As a direct and proximate result of the aforesaid breaches of implied warranties by Respondent, and/or its agents, workers, or employees, Claimants have sustained damage to their Home, and incurred substantial expenses associated therewith as set forth throughout this Complaint.

WHEREFORE, Claimants demand judgment against Respondent in an amount in excess of $100,000, together with costs, interest, and any other relief that the Arbitrator deems just and appropriate.

## COUNT IV
### Violation Of Unfair Trade Practices And Consumer Protection Law

35.     Claimants incorporate the previous paragraphs as though set forth at length herein.

36.     At all times relevant, Respondent, by and through its agents, employees, and workers, knew of the defects in Claimants' Home, and had a duty to advise Claimants of these defects under the Unfair Trade Practices and Consumer Protection Law.  73 P.S. §§ 201-1 et seq. ("UTPCPL").

37.     As set forth above, Respondent concealed and/or misrepresented the defective condition of the Claimants' Home and their warranty obligations, with the intent and purpose of inducing Claimants' reliance on the misrepresentations in violation of UTPCPL.

38.     Respondent misrepresented that the Home was constructed and/or conformed to accepted workmanlike standards when, in fact, it did not.  73 P.S. § 201-2(vii).

7

39.     Respondent failed to comply with the terms of a written guaranty or warranty given to Claimants.  73 P.S. § 201-2(xiv).

40.     Respondent engaged in fraudulent and/or deceptive conduct that created a likelihood of confusion or of misunderstanding on the part of Claimants.  73 P.S. § 201 -2(xxi).

41.     Claimants reasonably relied on Respondent's concealment and/or misrepresentations with respect to the condition of their Home and the Respondent's warranty obligations to their detriment.

42.     It was foreseeable that Respondent's concealment and/or misrepresentations regarding the true condition of Claimants' Home would cause the damages sustained by Claimants as described in this Complaint.

43.     As a direct and proximate result of the violations of the UTPCPL by Respondent, and/or its agents, workers, or employees, Claimants have sustained damage to their Home and incurred substantial expenses associated therewith as set forth above.

WHEREFORE, Claimants demand judgment against Respondent in an amount in excess of $100,000, including the imposition of treble damages, together with costs, interest, counsel fees, and any other relief that the Arbitrator deems just and appropriate.

Dated:  November 30, 2015                    Respectfully submitted,

_____
Stuart D. Lurie (I.D. No. 83391)
ROSENTHAL LURIE LLC
486 Thomas Jones Way, Suite 210
(484) 693-0788 – Tel.
(215) 600-1728 – Fax
Stuart@RosenthalLurie.com
*Attorney for Claimants*

8

File: j\wpfiles\jackie\asale.CV.doc - last revised 08.24.07 by jsh

*#4 ownership ↓*
*#17 vegetation/warranty*
*copy of emerg'l studies*
*electrical*
*plan*
*for*
*basement*

## AGREEMENT OF SALE

**AGREEMENT** made this <u>20th</u> day of <u>December</u>, **2009** by and between **W. B. HOMES, INC.** (hereinafter called "Seller"), whose address is 404 Sumneytown Pike, Suite 200, North Wales, Pennsylvania 19454, and <u>Rodwidge & Camille P. Desnoyers</u> (hereinafter called "Buyer"), whose address is <u>828 W Germantown Pike Norristown, PA.  19403</u> who agrees to buy the following lot and house to be constructed thereon:

| | | |
|---|---|---|
| Community: | **Club View at Indian Valley** | Buyers phone numbers: |
| Model: | <u>Kingsley Country Manor</u> | (H) <u>610-539-0537</u> |
| Lot Number: | <u>8</u> | (C) <u>484-250-9956 Her</u> |
| Township: | **Franconia** | (W)_____ |
| County/State: | **Montgomery County, PA** | (W-FAX)_____ |
| Street Address: | <u>592 Oakmont Drive West</u> | |
| | **Telford, PA 18969** | |

## WITNESSETH:

1. **PURCHASE/PROPERTY:** Seller, as the Equitable Owner, agrees to sell and convey to Buyer, and Buyer agrees to purchase from Seller, all that certain lot or piece of ground, together with improvements and house to be constructed hereon (hereinafter collectively referred to as the "Premises") known and designated as stated above.

2. **PRICE:** The base price for the Premises is: **Traditions Collection**

| | |
|---|---|
| **Traditions Collection** | $687,900.00 |
| Base House Incentive | $( 50,000.00) |
| Net Base House | $637,900.00 |
| Lot Premium | $   7,500.00 |
| Additional Item: Total for Extras - Exh.C # <u>1</u>: | $106,975.00 |
| Additional Item: | $_____ |
| **TOTAL:** | $752,375.00 |

| | |
|---|---|
| Price List Date: | 9/18/2009 |
| Option Manual Dated: | 11/1/2009 |
| Warranty Dated: | 7/14/2009 |

Purchase price shall be payable as follows:

| | |
|---|---|
| Cash or plain check at signing this agreement: | $ 30,000.00 |
| Add'l Payment: Due on or before<u>January 16, 2010</u>: | $ 62,216.00 |
| Add'l Payment: Due on or before_____: | $_____ |
| CASH or CERTIFIED CHECK at settlement: | $660,159.00 |
| **TOTAL:** | $752,375.00 |

1

The amount paid at the signing hereof, and any additional down payments listed in the previous paragraph, shall be paid directly to the Listing Broker, Coldwell Premier Properties., and shall be placed in an interest bearing escrow account until settlement; interest to be paid to the Buyer. However, any subsequent deposits for options purchased hereafter shall be paid directly to W.B. Homes, Inc.

3. **MORTGAGE APPLICATION:** This sale and settlement hereunder are not conditional or contingent in any manner upon the sale or settlement of any other real estate. This sale and settlement hereunder:

☐      Is not conditional or contingent upon any mortgage or financing.

☒      Is contingent upon mortgage financing as herein provided:

a.      Term and amount of mortgage loan required by Buyer:<u>30</u> years; $<u>550,000.00</u>

b.      Type of mortgage: <u>Conventional</u> Interest rate required: <u>5.50</u>%. HOWEVER, BUYER AGREES TO ACCEPT THE INTEREST RATE AS MAY BE COMMITTED BY THE MORTGAGE LENDER, not to exceed a maximum interest rate of <u>6.50</u>%

c.      Commitment date for approval of the mortgage:<u>1/20/2010</u>.

d.      Mortgage loan application shall be made by the Buyer, and if said mortgage loan cannot be obtained by the date in Paragraph "3(c)," this Agreement shall become NULL and VOID and all deposit monies shall be returned to Buyer on or before date for settlement as provided herein, subject however, to the provisions of paragraph 3 (e) and (f).

e.      Buyer shall make a completed application, in writing, to a responsible mortgage lending institution for the aforementioned mortgage loan within ten (10) days of the Seller's approval of this Agreement. Should the Buyer fail to make such completed application within the specified ten (10) days, fail to make any additional payments as specified in Paragraph #2 of this Agreement, furnish false or incomplete information to the Seller, the Seller's Agent, or the mortgage lender, concerning Buyer's legal or financial status, fail to cooperate in the processing of the mortgage loan application which acts would result in the failure to obtain the approval of a mortgage loan commitment, it shall be at the option of the Seller, within thirty (30) days thereafter to: (1) declare this agreement NULL and VOID, at which time all money paid on account will be forfeited to Seller, as liquidated damages, or (2) in the absence of written notice to the Buyer, by the Seller, declaring this Agreement NULL and VOID, the condition and contingency herein provided for in Paragraph 3 (a) through (g) shall no longer prevail, and this Agreement shall remain effective according to its

2

term in the same manner as if the condition and contingency were not a part hereof.

f.    Seller or Agent must receive a written commitment, for the mortgage loan, on or before the date specified in **Section #3** (c). **IN THE EVENT THAT BUYER SHOULD RECEIVE A COMMITMENT CONTINGENT ON THE SALE OF ANY OTHER PROPERTY, IT SHALL BE DEEMED A COMMITMENT FOR THE PURPOSES OF THIS AGREEMENT, EVEN IF SAID PROPERTY IS NOT SOLD PRIOR TO THE DATE OF SETTLEMENT CALLED FOR UNDER THE TERMS OF THIS AGREEMENT. FURTHERMORE, IN THE EVENT BUYER SHOULD RECEIVE A COMMITMENT THAT IS NOT VALID UNTIL THE DATE OF COMPLETION OF THE PREMISES, OR LAPSES PRIOR TO COMPLETION OF THE PREMISES, OR IF THE INTEREST RATE PROVIDED WITHIN THE COMMITMENT IS NOT FIXED UNTIL THE DATE OF COMPLETION OF THE PREMISES IT ALSO SHALL BE DEEMED A COMMITMENT FOR THE PURPOSES OF THIS AGREEMENT.** If said commitment is not furnished with the terms as specified herein, or on other terms accepted in writing by the Buyer on or before the specified date, Seller shall have the option, at that date, or any other time thereafter during the term of this Agreement until, but not beyond the date of receipt of the written commitment by the Seller or Agent, to declare this Agreement NULL and VOID by written notice to the Buyer of his decision to cancel, at which time all deposit monies paid on account shall be returned to the Buyer. It is understood that Seller shall be under no obligation to commence construction until Buyer has supplied Seller with a copy of the Mortgage Commitment called for herein.

Buyer agrees to timely and expeditiously comply with all terms and conditions of the mortgage contingencies (if any) and subsequent mortgage commitment and such stipulated commitment conditions as may require compliance by Buyer to timely secure said loan.

Buyer agrees not to incur additional debt after the execution of this Agreement which would interfere with Buyer's ability to obtain the Mortgage Commitment or keep it in effect.

g    It is understood and agreed between parties hereto that the Seller's Agent is authorized to communicate with the lender for the purpose of assisting the loan approval process; however, the Seller is under no obligation whatsoever to secure a mortgage for Buyer. However, if Buyer is unable to obtain a valid mortgage commitment on their own, both parties agree that Seller and/or Listing Broker shall have the option to attempt to obtain a mortgage for Buyer from a reputable mortgage lending institution or bank for a period of forty-five (45) days after notice from Buyer of Buyer's inability to obtain a mortgage commitment. The mortgage obtained by

Seller and/or Listing Broker shall comply with Paragraph 3(a) and 3(b). Buyer shall cooperate fully with Seller and/or Listing Broker through this process and complete any applications required, as well as provide any and all financial information required.

h.     It is understood and agreed that upon receipt of a Mortgage Commitment according to the terms specified herein, or on other terms accepted in writing by the Buyer, the mortgage condition and contingency herein provided for in Section #3(a) through (g) shall no longer prevail and this Agreement shall remain effective according to its terms in the same manner as if the condition and contingency were not a part hereof.

4.     **EQUITABLE OWNER:**  Buyer acknowledges that W.B Homes, Inc. is the equitable owner of the tract of ground, which is the subject of this Agreement of Sale.  Buyer further acknowledges that at settlement, the deed to Buyer will be from the legal owner of the property but that Buyer's dealings and contractual relationships have solely been with Seller, and Buyer agrees to look solely to Seller for performance of this Agreement and agrees to indemnify and hold harmless the legal owner from any claim or cause of action arising out of the construction of the home contemplated herein.

5.     **TITLE:**  Seller, at the time of settlement, shall grant and convey to Buyer by delivery of a special warranty deed, good and marketable title to the Premises and such as will be insured at regular rates by a responsible title insurance company doing business in this area free and clear of all liens, encumbrances, easements and restrictions except the following:

a.     Easements, servitudes, restrictions, or covenants now of record or apparent from an inspection of the Premises.

b.     Laws, ordinances, requirements, rules and regulations of any governmental, and/or quasi-governmental body, or Community Home Owner's Association having jurisdiction.

c.     Easements of roads, privileges, and rights of public and private utilities.

d.     Easements with respect to public or private storm sewers or service water course.

e.     Agreements & easements with telephone, gas, water, electric, T.V. cable, and other public utility companies.

f.     Zoning ordinance and  any other  act, ordinance, or regulations affecting the use of any improvement to said premises.

g.     Department of   Transportation issuance of a highway occupancy permit, if required, to access a public road.

h.   The items set forth in paragraph #5(a) through #5(g) may be items that are added subsequent to the date of this Agreement of Sale in order to properly complete this community.

If Seller cannot deliver title as herein provided, Buyer shall have the option of taking such title as Seller can give, without abatement of price or of being repaid all monies paid by Buyer without interest, and in the latter event, this Agreement shall terminate and neither party shall have any further liability to the other.

6.   **AGENTS OF SELLER: IT IS UNDERSTOOD THAT THE LISTING BROKER, COLDWELL BANKER PREMIER PROPERTIES AND/OR ANY OF ITS DESIGNATED LICENSEES WORKING WITH SELLER ARE THE AGENTS OF THE SELLER ONLY AND WILL IN NO CASE BE LIABLE TO EITHER PARTY FOR THE PERFORMANCE OF ANY OF THE TERMS OR COVENANTS OF THIS AGREEMENT OR FOR DAMAGES FOR NON-PERFORMANCES THEREOF. FURTHER, NO AGENT OF SELLER HAS ANY AUTHORITY TO MAKE ANY REPRESENTATIONS, COVENANTS, AGREEMENTS, OR THE LIKE WITH RESPECT TO THE PREMISES. WHEN THE LISTING BROKER AND SELLING BROKER ARE THE SAME, THE BROKER IS A DUAL AGENT, WHICH APPLIES TO ALL LICENSEES UNLESS THERE ARE DESIGNATED SELLER AND DESIGNATED BUYER AGENTS. THIS AGREEMENT CONTAINS THE ENTIRE AGREEMENT BETWEEN PARTIES, AND IT MAY BE CHANGED ONLY BY A WRITING EXECUTED BY ALL PARTIES HERETO. THE LEGISLATURE HAS ESTABLISHED A REAL ESTATE RECOVERY FUND. THE PURPOSE OF THIS FUND IS TO COMPENSATE PERSONS WHO OBTAIN A JUDGEMENT IN A COMPETENT COURT OF LAW BECAUSE OF FRAUD, MISREPRESENTATION OR DECEIT OF ANY AGENT. FOR FURTHER INFORMATION, CALL (717)783-3658.**

7.   **AUTHORIZATION TO ORDER TITLE INSURANCE:** Buyer hereby authorizes Seller to order, on behalf of Buyer, title insurance from **North Penn Abstract** title insurance company, provided Seller has not been notified by Buyer, in writing, within ten (10) days of the date of this Agreement, of Buyer's election to revoke this authorization. In addition, Seller's sales agent may perform services for Buyer in conjunction with financing, insurance and document preparation. Buyer further authorizes Seller's sales agent to prepare documents and other conveyancing services for settlement.

8.   **POSSESSION:** Possession of the premises shall be delivered by Seller to Buyer at Settlement hereunder by delivery of said special warranty deed and key. The terms of the Limited Warranty of the Seller shall survive Settlement.

Because of dangers involved in construction areas, Buyer agrees not to enter upon the premises or into any portion of the dwelling to be constructed thereon or at any time to interfere in any manner with construction upon the premises unless and until ac-

5

companied by a representative of the Seller.  Buyer shall, in advance, contact Seller or Seller's representative at Seller's office or such suboffice or location as Seller may designate in order to arrange any inspection of the premises or the dwelling to be constructed during normal business hours (Monday through Friday; 8:30 a.m. to 4:00 p.m. and excluding holidays).  Seller shall not be responsible for any physical injury or damage to property caused by any unauthorized entry by Buyer, and Buyer hereby relieves Seller and Seller's agents, employees, or workmen of and holds Seller and Seller's agents, employees and workmen harmless from any and all liability or claims arising out of any unauthorized entry.

9.  **WAIVER:**  Formal tender of Deed and tender of monies are hereby waived.

10.  **SETTLEMENT:**  Settlement hereunder shall be held on a date which is ten (10) days after the Seller shall supply Buyer with a notice of Settlement.  However, at the time of settlement, the house and premises shall have been substantially completed.  In no event shall settlement be held unless Seller can provide at settlement a "Use & Occupancy Permit" from the municipality.  Settlement shall be held at either (a) the offices of Coldwell Banker Premier Properties., or (b) the offices of the Seller, during normal business hours.  Time is of the essence in this agreement and of the performance of each and every term and condition hereof.

In an effort to assist Buyer in formulating future plans, it is anticipated that the settlement date will be July 15, 2010.  However, Seller reserves the right to delay commencement and/or completion of construction until Buyer has received a valid mortage commitment in accordance with Paragraph #3.  Additionally, if commencement of construction, completion and/or settlement are delayed due to inclement weather, strikes, delays in issuance of permits, unavailability of labor or materials for any reason beyond Seller's control, such times and settlement hereunder shall be automatically extended accordingly.

11.  **SETTLEMENT COSTS, TAXES:**  The Seller, at Seller's expense, shall prepare the special warranty deed to the Premises.  Seller and Buyer shall each pay one-half (1/2) of any state or local realty transfer taxes.   Buyer shall pay all title insurance charges, hazard insurance, recording charges, and charges in connection with Buyer's mortgage, if any.  Real estate taxes, water and sewer rentals, Homeowner's Association fees, and any other periodic government or municipal charges affecting the premises shall be apportioned between the Buyer and Seller as of the date of Settlement.

12.  **RISK OF LOSS:**  The risk of loss or damage to the house and to any personal property and fixtures being sold hereunder, whether by fire, other casualty or any other cause whatsoever, shall be on the Seller from the date hereof to the date of Settlement.  In the event of fire or other casualty, settlement will be postponed until Seller is able to restore or rebuild the house.

13.  **DEFAULT BY SELLER:**  If Seller shall default hereunder including Seller's refusal to proceed to settlement with Buyer, Buyer's sole remedy shall be to be repaid the amounts heretofore paid by Buyer on account of the purchase price, together with liquidated damages in the amount of $1,000.00 and of being reimbursed for reasonable title

6

insurance company charges and reasonalble mortgage application fees heretofore incurred, in which event this Agreement shall terminate and neither of the parties shall have any further rights or obligatins hereunder.

14. **DEFAULT BY BUYER:** Should Buyer violate or fail to fulfill any of the terms and conditions of this Agreement, all amounts heretofore paid by Buyer on account shall be retained by Seller (a) on account of the purchase price with a balance being recovered through a suit for specific performance, or (b) as liquidated damages for such breach, or (c) as partial damages in the event Seller should elect to resell the property and claim against Buyer the amount of damages which Seller has incurred as a result of Buyer's break. Seller shall have the option to elect any of the above remedies.

15. **BUYER'S SELECTION OF OPTIONS:** Seller will offer to Buyer a specific list of changes or additions (Options) to the Plans. Buyer may request such options only by submitting to Seller, on Seller's form, (Exhibit "C") a written authorization of Seller for such options. Seller promises to convey as part of the dwelling, such extras as shall be scheduled and agreed upon by the parties herein as shown on Exhibit "C", which is attached hereto and made a part hereof. Except for the inclusion of the enumerated extras as fully set forth, no changes in construction or in completion ordered by Buyer will be made unless authorized, in writing, by Buyer at a cost agreed upon and approved by Seller in writing. In the event Buyer desires to select any additional extras or to make any other changes after the Agreement of Sale and Original Extras Agreement (Exhibit "C" - #1) have been signed by both parties, they may do so under the following conditions:

a. Buyer will immediately pay to Seller up to 50% of the cost of such changes or extras with the balance of the extras due at settlement. In the event that the Seller does not obtain said monies, the extras or changes will not become part of the Agreement.

b. In the event that settlement is not held under the terms of this Agreement for any reason other than default by Seller, any monies paid to Seller for extras ordered shall in no instance be refunded.

c. Seller's responsibility for omission of any option purchased after the Agreement of Sale and the first "Extra's Agreement" (Ex. C #1) have been signed shall be limited to the cost paid by Buyer therefore, and any such omission shall not invalidate the Agreement.

16. **COLOR SELECTIONS:** Buyer shall make all the necessary color selections within ten (10) days of notice from Seller directing Buyer to do so. In the absence of such selection by Buyer, within the aforementioned time period, Seller is hereby irrevocably authorized to proceed with the installation of material of a color and design selected by Seller.

17. **VEGETATION EXISTING PRIOR TO CONSTRUCTION/WOODED AREAS:** Seller will attempt to preserve as many of the existing trees or shrubs as reasonably

7

possible during the construction of the improvements and house on the premises.  It is expressly agreed, however, that Seller does not guarantee or warrant the survival of any of the trees or shrubs existing on the premises prior to the said construction.  Any existing trees or shrubs on Buyer's lot that may die after settlement are the sole responsibility of Buyer. The Seller shall be responsible to grade and seed the disturbed areas of the lot only.  As to the quality or quantity of growth of grass, it is Buyer's sole responsibility to water, fertilize and reseed as necessary.

Any soil washouts from rain or melting snow or burnouts due to droughts after settlement are the sole responsibility of the Buyer; unless caused by improper grading.

18.   **SELLER'S SUBDIVISION PLAN *AND REPAIRS AFTER SETTLEMENT*:** Buyer acknowledges that Buyer has reviewed the final subdivision plan as approved by the Township.  Seller, its agents or contractors, shall have a temporary easement across and upon the lot being purchased in order to complete any work which may be required to be done by Seller after the date of settlement due to site conditions or at the request of governmental authorities.  Seller shall use due care not to unduly injure the premises in the course of such construction.

19.   **PROPERTY CORNERS:** Buyer agrees to reimburse Seller $250 at settlement for having a registered surveyor install iron pins at all property corners.

20.   **DELAYS IN CONSTRUCTION:**  In the event that completion of construction of the premises is delayed due to inclement weather, strikes, government regulations, delays in obtaining or issuance of permits or mortgage commitments or approvals or inspection or any act of God, storm, wind, or fire damage delays by reasons of inability or failure of Seller's subcontractors to perform despite Seller's best efforts to effect performance, or for any other reason which is beyond the control of the Seller, Seller may extend the date of Settlement until such time as completion of the house may require or the Buyer may elect to complete Settlement and take possession of the premises in which case all monies due under this Agreement, together with costs due for options or extras shall be paid in full by the Buyer at Settlement, provided Seller shall furnish buyer with a letter guaranteeing completion of any incomplete work within a reasonable time as weather conditions and availability of materials permits.  Seller is not responsible for and is hereby released from any loss, liability, expense, costs or incidental or consequential damages which may result by reasons of delay.

21.   **DELAYS IN COMPLETION OF EXTERIOR ITEMS:**  Buyer hereby acknowledges that due to inclement weather, grading and seeding, exterior painting and/or staining, exterior concrete walkways/patios, and driveway top coat may not be complete at the time of Settlement.  Buyer acknowledges and agrees that no monies or funds shall be placed in an escrow account or withheld from the Seller at the time of Settlement to compensate for such incomplete items, whether required by the municipality or Buyer's mortgage company.  However, upon request by Buyer, Seller shall furnish Buyer a letter at settlement guaranteeing completion of any incomplete work within a reasonable amount of time.

22.  **OUTSIDE CONTRACTORS:** It is acknowledged and agreed by the Buyer that until settlement has taken place, the Buyer will not employ any outside contractors or suppliers to work on the premises.

23.  **LIMITED WARRANTY:** Seller agrees to provide to Buyer at settlement a five (5) year limited warranty. For the purposes of this Agreement the five (5) year limited warranty shall be referred to as Exhibit "A". **BUYER ACKNOWLEDGES THAT HE HAS REVIEWED SAID "LIMITED WARRANTY"; A COPY OF WHICH IS AVAILABLE AT SALES OFFICE AND AT BUILDER'S OFFICE (404 SUMNEYTOWN PIKE, NORTH WALES, PA). BUYER ACKNOWLEDGES AND AGREES THAT SAID "LIMITED WARRANTY" (EXHIBIT "A") SHALL BE THE SOLE AND EXCLUSIVE WARRANTY CONCERNING THE CONSTRUCTION OF THE SUBJECT HOUSE AND PREMISES, AND ALL OF THE RIGHTS, REMEDIES AND OBLIGATIONS WITH RESPECT TO ANY WARRANTY CONCERNING SAID CONSTRUCTION SHALL BE AS SET FORTH IN EXHIBIT "A". NO IMPLIED WARRANTY (WHETHER OF MERCHANTABILITY, HABITABILITY, FITNESS FOR A PARTICULAR PURPOSE OR OTHERWISE) IS GIVEN ON PORTIONS OF THE PREMISES OTHER THAN CONSUMER PRODUCTS. THE MAXIMUM LIABILITY OF SELLER UNDER THIS WARRANTY SHALL BE THE REPLACEMENT COST OF THE DEFECTIVE PORTION OF THE UNIT. IN NO EVENT SHALL SELLER BE RESPONSIBLE FOR SPECIAL OR CONSEQUENTIAL DAMAGES OR PERSONAL INJURIES ARISING FROM ANY BREACH OF THIS WARRANTY.**

24.  **MOLD:** Mold is found in both the indoor and outdoor environment, including homes. Mold growth is highly dependent on the presence of moisture. When a mold spore comes into contact with a wet or damp surface indoors, the mold begins to grow. Mold spores will not grow unless there is moisture present in your home. Therefore, as a homeowner, whether or not you experience mold growth depends to a large extent on how you manage and maintain your home, and whether there is a source of moisture present in your home. As a homebuilder our responsibility as Seller is limited to things that we can control, and which are provided for in our "LIMITED WARRANTY". By executing this Agreement of Sale you as Buyer agree that as a homebuilder we as Seller are not responsible and hereby disclaim any liability for any damages, illness, or allergic reactions which the Buyer, or Buyer's family members, friends, or guests may experience as a result of mold, mildew, fungus, or spores, to include, but not be limited to property damage, personal injury, loss of income, emotional distress, death, loss of use, loss of value, adverse health effects, or any other effects.

25.  **RADON:** Seller has installed a Radon Stack from the underside of the basement ceiling up into the unfinished attic area. This radon stack does not guarantee that radon gas will not be present in the unit. It does, however, provide a safe and cost effective way for Buyer to mitigate any radon gas that may be present.

Seller has offered to Buyer as an optional extra a system to ventilate any radon gas that may be present after the construction of the dwelling contemplated herein. ("Radon

\* **There are no constraints that would affect emergency vehicles access. There is an Emergency Vehicle Access proposed on Lot #17.**

(12) The zoning of the development and abutting properties as shown in the municipality's most recent Zoning Map.
\* **The property located North West and North of the site is zoned REC. The property located North East of the site is zoned R-175. The property across Godshall Road that surrounds the existing REC Zoning/Park Use are R-130.**
\* **Please refer to the Zoning Ordinances for allowable uses for these districts. The complete and current copyu of the Franconia Township Zoning Ordinance is available in the Sales Office for review.**
\* **Please refer to the Zoning Map in the Sales Office for more complete information on zoning of adjacent or nearby properties.**

(13) Proposed new road right-of-ways, temporary cul-de-sac(s), etc, within, adjacent, or near to development, shown on the official map of the municipality, if any exists.
\* **There are no proposed new road right-of-ways.**

(14) Buyer is aware that sewage and water facilities for this community will be provided as follows:
a.)Sewer: **By Franconia Township Sewer Authority**
b.) Water: **By North Penn Water Authority**

(15) Buyer is aware of any proposed fences to be installed within the community.
\* **There will be 3-rail vinyl fence installed on or immediately adjacent to the rear property lines of Lots #9, #10, #11, #12, #13, #14, #15, #16 and #17**

(16) Buyer of Lot #5 is aware that Declarant will be constructing and installing entrance signage and landscaping along the entire Godshall Road frontage of the Development. The Homeowners of this Lot shall be responsible for the permanent maintenance of said facilities, as more fully described in the "Homeowner's Association Documents".

(17) The BUYER is aware that Lots #1, #2, #3 and #4 are serviced by a "Common Driveway". The ownership and maintenance responsibilities associated with the Common Driveway are clearly defined within the Homeowner's Association Declaration.

(18) The BUYER has seen and reviewed any known environmental surveys, studies or reports done on the property.
\* **A copy of the Phase I Environmental Assessment as prepared by Boucher & James, Inc., dated November 8, 2002 is available for review at the Sales Office.**

18

**EXPEDIENT TO DO SO, AND SELLER SHALL HAVE THE RIGHT TO MAKE ANY CHANGE OR CHANGES IN THE CONSTRUCTION OF THE SAID PREMISES THAT SELLER MAY FIND NECESSARY IN THE COURSE OF CONSTRUCTION OR WHICH ARE REQUIRED BY GOVERNMENT REGULATION.**

Buyer hereby acknowledges that the house which he has selected will be constructed as a Left hand hand house (i.e., a house having a front elevation with the garage to the Left hand when looking at house from the front).

29.    **BUYER INSPECTION OF PREMISES:**  The Buyer is purchasing the premises upon the basis of the Buyer's own investigation and without regard to any representations, statements, promises, or the like made by the Seller or any agent or representative of Seller, except as specifically set forth in this Agreement of Sale.

30.    **APPROVAL OF OWNER:**  This Agreement of Sale is not valid and is not binding upon Seller unless and until this Agreement of Sale is executed by an authorized representative of the Seller.

31.    **GOVERNING LAW:**   This Agreement shall be governed by the laws of the Commonwealth of Pennsylvania and shall inure to the benefit of and bind Seller and Buyer and their respective heirs, executors, administrators, successors and assigns, provided that neither this Agreement nor any interest therein shall be assignable in whole or in part by Buyer, except with the prior written consent of Seller.

32.    **NOTICES:**  Notices hereunder shall be given registered or certified mail, postpaid, return receipt requested, addressed to Seller at the address on page one hereof and if to Buyer at the address on page one hereof.

33.    **RECORDING:**  This Agreement shall not be recorded.

34.    **HEADINGS:**  The headings in this Agreement are for convenience of reference only and shall not affect the construction hereof.

35.    **DRAFTING OF AGREEMENT:**  This Agreement was drafted by Seller as a convenience to both parties, and it is agreed that this Agreement shall not be construed against Seller because it was drafted by Seller.

36.    **NO REPRESENTATIONS:**  This Agreement contains the whole Agreement between the Seller and Buyer and there are not other terms, obligations, covenants, representations, statements, or conditions, oral or otherwise of any kind whatsoever, except such addendum, which may be attached to this Agreement.

37.    **ZONING:**  The zoning classification of the property being sold is **R-175 Residential**. This statement is required to be made by law; otherwise, the Agreement of Sale would be rendered void and the deposits tendered by Buyer would be returned to Buyer without the requirement of court action.  Additionally, access to a public road may

11

require issuance of a highway occupancy permit from the Dept. of Transportation. Seller has arranged all necessary highway occupancy permits.

38.    **ARBITRATION:**  All claims, disputes, and other matters of questions, both before and after settlement, arising out of or relating to this Agreement of Sale or the house and lot or unit being purchased, including without limitation, any dispute over the previously referenced "LIMITED WARRANTY", any claim of breach of contract, negligent or intentional misrepresentation or nondisclosure in the inducement, execution or performance of any contract, including this arbitration agreement, and breach of any alleged duty of good faith and fair dealing, shall be submitted to arbitration by and pursuant to the rules of Construction Arbitration Services, Inc. (hereinafter "CAS") in effect at the time of the request for arbitration, or by such other arbitration service as both parties shall mutually agree to, and pursuant to the rules of that arbitration service in effect at the time of the request for arbitration.

This arbitration agreement shall inure to the benefit of, and be enforceable by, the Builder's subcontractors, agents, vendors, suppliers, design professionals, insurers and any other person whom the homeowner contends is responsible for any defect in or to the subject Home or the real property on which the subject Home is situated. Any party shall be entitled to recover reasonable attorney's fees and costs incurred in enforcing this arbitration agreement, and the arbitrator shall have sole authority to award such fees and costs. The decision of the arbitrator shall be final and binding and may be entered as a judgment in any State or Federal court of competent jurisdiction.

This arbitration agreement shall be deemed to be a self-executing arbitration agreement. Any disputes concerning the interpretation or the enforceability of this arbitration agreement, including without limitation, its revocability or voidability for any cause, the scope of arbitrable issues, and any defense based upon waiver, estoppel or laches, shall be decided by the arbitrator.

The initiation of or participation by any party in any judicial proceeding concerning this arbitration agreement or any matter arbitrable hereunder shall not be deemed a waiver of the right to enforce this arbitration agreement, and notwithstanding any provision of law to the contrary, shall not be asserted or accepted as a reason to delay, to refuse to participate in, or to refuse to enforce this arbitration agreement.

Any party who shall commence a judicial proceeding concerning a dispute, which is arbitrable hereunder, shall also be deemed to be a party requesting arbitration within the meaning of this arbitration agreement.

The administrative fee charged by the arbitration service shall be borne equally between the Homeowner and the Builder. The arbitrator's compensation fee shall be borne equally by the arbitrating parties for single-arbitrator arbitrations. Additional fees may be assessed in accordance with the arbitration rules and fees.

No arbitration proceeding shall involve more than one (1) single-family attached or detached dwelling.

If any provision of this arbitration agreement shall be determined by the arbitrator or by any court to be unenforceable or to have been waived, the remaining provisions shall be deemed to be severable therefrom and enforceable according to their terms.

39.    **RESIDENTIAL DISCLOSURE STATEMENT:** Seller desires to provide Buyer with information regarding the property to be sold.  This information is intended to benefit the BUYER by clearly defining the nature of the property, inclusive of any restrictions or conditons that may affect its desirability, suitability, and/or current or future value. BUYER acknowledges that (a) Seller has provided Buyer with a "RESIDENTIAL DISCLOSURE STATEMENT", (a copy of which is attached herto and made a part of this Agreement); (b) that Seller has reviewed the document and pertinent back-up information with Buyer, and (c) that Buyer has executed the "RESIDENTIAL DISCLOSURE STATEMENT" prior to executing this Agreement of Sale.

40.    **HOMEOWNERS ASSOCIATION:**  Buyer acknowledges that there will be a Homeowner's Association for this community.  For complete information regarding this Homeowner's Association, one time initiation fee and Annual Assessment, please see the "Public Offering Statement", "Declaration", "By-Laws", and "Proposed Budget" of the Association.  All of these documents are available at the Sales Office.

This Agreement may be executed in any number of counterparts, each of which will be deemed "an original".

**IN WITNESS WHEREOF,** the parties hereto, intending to be legally bound hereby, have hereunto set their hands and seals, the day and year first above written.

**BUYER** _____  **DATE** _____

**BUYER** _____  **DATE** _____

**WITNESS:**_____  **DATE**_____

**SELLER** _____  **DATE** _____

**SELLER** _____  **DATE** _____

**WITNESS:**_____  **DATE**_____

13

## RESIDENTIAL DISCLOSURE STATEMENT

SUB-DIVISION:    **Club View at Indian Valley**

LOT #:8

BUYERS NAME: Rodwidge & Camille Desnoyers

### THIS DOCUMENT IS FOR YOUR PROTECTION.
### READ IT CAREFULLY BEFORE SIGNING.

**SELLER** desires to provide **BUYER** with information regarding the property to be sold.  This information is intended to benefit the **BUYER** by clearly defining the nature of the property, inclusive of any restrictions or conditions that may affect its desirability, suitability, and/or current or future value.  It is your obligation to evaluate the information and to consider its implications relative to your situation.  The importance of understanding the material presented to you cannot be overstressed.

**If you have any questions, you are advised that the SELLER or the SELLER'S agent(s) may not be qualified to render explanations or interpretations of the information required to be disclosed.  You are advised to seek the assistance of an unbiased professional prior to signing the Agreement of Sale.**

The **SELLER** will make available the current information, required by this document, in effect as of the date of the subdivision or land development approval, and to thereafter update the required disclosures so that at all times the information is made available, the information is current.

14



## RESIDENTIAL DISCLOSURE STATEMENT

Please initial next to each of the following to verify that information about each of the following was presented and explained with regard to your property.

_____  (1) Public or private common areas, such as parklands, street stub streets, open space, walking paths, etc. and the access to these areas. **There are no parklands or stub streets within this community. The only "open space" areas are the two (2) cul-de-sac planting areas. There is an "Emergency Access/Walking Path" located on Lot #17, that will connect this community to the adjacent community.  This "Emergency Access/Walking Trail" will extend through another community to the existing Fariway Drive. This Emergency Access/Walking Trail is situated on Lot #17 and is clearly shown on pages #4 and #8 of the "Plan of Subdivision".**

_____  (2) All lot lines within the development. **All lot lines and lot sizes within the development are clearly shown on the "Plan of Subdivision – Record Plan", sheets 1 through 4 of 26 of the Engineering Plans, prepared by Schlosser & Clauss Consulting Engineers.  These sheets also provide the actual square footage of each lot.**

_____  (3) Membership in a common ownership regime, such as a Homeowners or Condominium Association, if applicable.  A copy of the "Public Offering Statement", "Declaration" and/or "By-Laws", if applicable are available at the Sales Office. **Each Homeowner will be subject to the Declaration of "Club View at Indian Valley Planned Community". A full and complete copy of the Public Offering Statement and Declaration is available at the Sales Office.  This Declaration also contained specific lot use restrictions.**

_____  (4) Current Zoning of the lot.  All uses presently permitted within the development by the Zoning Ordinance, including accessory uses, and all deed restrictions, and other restrictions, which affect the development of the lot.  Buyer is aware that the current Zoning Regulations are subject to change. **a)  Current Zoning of this Community is R-175 Residential.**

15

    b) **Please refer to Section 145-29 through 145-32, pages 14532 through 14536 of the Zoning Ordinance for permitted uses (attached).**

    c) **Please refer to Section 145-18, pages 14525 through 14526 for information on accessory uses (attached).**

    d) **Please refer to Homeowners Association Declaration and By-Laws for additional restrictions.**

    e) **Full copy of current zoning ordinance is available at the Sales Office.**

_____ (5)  The location of all easements of record through the development, describing the uses, including, but not limited to; sanitary sewer, storm water, domestic water, gas, electric, telephone, cable or any other utility.

  \* a.) **All permanent Easements (exclusive of electric, telephone and cable) are clearly shown on Page 1 through 4 of the Engineering Plans. The purpose of each easement and the improvements that are located within the easement are shown on pages #6, #7, and #8 of the Engineering Plans.**

    b) **Additionally, although not shown on plans, the Electric, and Cable T.V. providers are granted permanent Easements to provide service to each lot.**

_____ (6)  All current dimensional requirements for the primary use on each lot, such as setback requirements, building coverage, impervious coverage, and height limitations.

  \* a) **Please refer to "Zoning Data" as shown on page 1 of 26 of the full Engineering Plans.**

    b) **Maximum allowable building coverage is 10%.**

    c) **Maximum allowable impervious coverage is 70%.**

    d) **Maximum allowable height is 35'.**

  \* e) **Complete copy of the <u>current</u> Zoning Ordinance is available at the Sales Office.**

_____ (7)  All current dimensional requirements for all accessory uses (decks, pools, sheds, etc.) such as size setback requirements, and height limitations.

  \* a) **Please refer to Section 145-18, pages 14525 through 14526 of the Zoning Ordinance for all dimensional requirements for the above reference accessory uses.**

  \* b) **Complete copy of the current Zoning Ordinance is available at the Sales Office.**

_____ (8)  The location of all areas which are classified as wetlands, floodplains, or other resources conservation areas by current law.

16

The use and development of these areas may be severely restricted. The BUYER understands substantial penalties exist for violations of these restrictions;

**\* There are no wetlands or waters of the United States on any lots. There are areas of Waters of the "Commonwealth" present on the following lots: #1, #2, #3, #4, #8, #16 and #17.  These areas are clearly shown on the "Grading and Utility Plan", sheets #6, #7 and #8 of 28 of the Engineering Plans.**

**These areas may not be rerouted, diverted, enclosed or dammed at any time for any reason.**

(9)  The location within the development and on each lot of flood plain area.

**\* There are no flood plains in the Club View at Indian Valley subdivision.**

(10)  The location of all storm water management facilities, including detention/retention basins, storm water management easements, defined swales, and the ownership and maintenance responsibilities for each.

**\* Please refer to the "Site Improvement Plan", pages 6 thru 11 of 26 of the full Engineering Plans.  These pages clearly show the location of all storm inlets, detention basin(s), defined swales, and other storm water management appurtenances, the grading of each lot, and the path of storm water runoff.**

- **All storm sewer and appurtenances within Public R.O.W. are to be dedicated and will be owned and maintained by Franconia Township.**
- **All storm sewer and appurtenances located on an individual lot will be owned by Lot Owner, and be maintained by Lot Owner with the exception of the Storm Sewer System situated on the common property line of lots #7 and #8.  This Storm Sewer System will be owned and maintained by Franconia Township and the residents of the "Club View at Indian Valley" shall be assessed by Franconia Township for any maintenance costs.  Please refer to the Homeowner Association Documents for additional language pertaining to the maintenance of this system.**
- **The detention basin will be owned by Lots #1 and #2 and be maintained by Lots #1 and #2.**

(11)  Any constraints which would affect emergency vehicles' accessibility to the development;

17

(19)  BUYER is aware and acknowledges that upon completion, the Seller will offer the following road rights-of-way for dedication to the following entity:

| **Road Right-of-Way** | **Entity Dedicated to** |
|---|---|
| 1.  Oakmont Drive East and West, Augusta Drive and the frontage along Godshall Road. | Franconia Township |

Upon the Township accepting these road Rights-of-Way for Dedication they will be responsible for all of the required maintenance of the roads, storm sewer, etc., (including snow plowing) within these road Rights-of-Way.  In addition, the following utilities will also be dedicated to the appropriate authority:

a.) Public Water:  Dedicated to North Penn Water Authority.
b.) Public Sewer:   Dedicated to Franconia Township Sewer Authority.

**I/We the undersigned, acknowledge that a full set of "Final Development Plans (including Record Plans)", as well as Electric/Utility Plans, Wetlands Report, Environmental Study, Zoning Map, Declaration of Covenants, Easements and Restrictions, Homeowners Association Declaration, and Public Offering Statement, Entrance Signage Easement and related material referred to in this document were made available to me/us detailing the scope of the subdivision and/or land development plan of which the considered property is a part, and understand and agree to the constraints imposed therein with regard to my/our property.  I/We also understand that signing this Disclosure Statement does not release me/us from meeting requirements of any of the Codes of the Municipality.**

_____        _____
Purchaser                                        Owner or Authorized Agent

_____
Purchaser

_____
Date

19



EMPLOYMENT LITIGATION
COMMERCIAL LITIGATION
GENERAL COUNSEL SERVICES
EXECUTIVE ADVOCACY
NFL RETIREMENT AND DISABILITY

Stuart D. Lurie
(p) 484.693.0788
(f) 215.600.1728
Stuart@RosenthalLurie.com

*Reply to Exton Office*

October 16, 2014

***Via First Class Mail and E-Mail (jackb@wbhomesinc.com)***

Jack Boyd, Vice President of Operations
W.B. Homes, Inc.
404 Sumneytown Pike, Suite 200
North Wales, PA 19454

> **Re:   Rodwige and Camille Desnoyers**
> **592 Oakmont Dr. West, Telford, PA 18969**

Dear Mr. Boyd:

This firm represents Rodwige and Camille Desnoyers.  In late December 2009, the Desonyers purchased a new single-family residence to be constructed by W.B. Homes at 592 Oakmont Drive West, Telford, PA 18969.

In the spring of 2014, the Desnoyers contacted W.B. Homes to report problems of water and moisture intrusion through the stucco exterior of the home.  The problems were detailed in a written Moisture Intrusion Evaluation report from Frank Hendron of Northeast Inspection Corporation ("NIC"), a copy of which was provided to W.B. Homes.  The NIC report revealed significant construction defects, including, without limitation:

- Inadequate or non-existent caulking around windows and doors;
- Inadequate or non-existent installation of flashing around windows and doors;
- Inadequate or non-existent joints between stucco and other exterior building materials;
- Improper termination of stucco below grade;
- Improper installation or placement of weep screeds; and
- Inadequate thickness of stucco and improper attachment of wire lath to framing.

These defects are material because, among other problems, they allow water to penetrate the exterior of the home, where it becomes trapped within the wall systems, causing rotting and deterioration of the substrate and framing, as well as mold.  Indeed, the NIC report revealed

PHILADELPHIA
1500 JFK BOULEVARD
SUITE 1230
PHILADELPHIA, PA 19102

WWW.ROSENTHALLURIE.COM

EXTON
486 THOMAS JONES WAY
SUITE 210
EXTON, PA 19341

elevated moisture readings at a number of sampled locations, strongly indicating the presence of hidden damage.

In response to the NIC report, W.B. Homes engaged the services of Craig Tillman of Tillman Inspections, LLC to perform further moisture testing through additional probes. The report generated by Tillman confirmed many of the elevated moisture levels from the NIC report. Despite these elevated readings, however, Tillman opined that no significant remediation was necessary. Seemingly on the strength of the Tillman report, W.B. Homes has, accordingly, refused to perform any remediation.

We are not satisfied with the opinions expressed in the Tillman report and W.B. Homes' refusal to stand behind its workmanship and its warranty. As both the NIC report and the Tillman report acknowledge, the home exhibits numerous elevated moisture levels, which are indicative of failure of the stucco/stone veneer systems. The full extent of damage caused by the above-described faulty construction methods cannot be fully known until the stucco exterior is removed to reveal any damaged substrate and framing caused by water infiltration. Furthermore, faulty construction methods can be expected to cause additional failure in time, regardless of whether moisture readings have reached elevated levels to date.

Be advised that the Desnoyers will seek to hold W.B. Homes legally and financially responsible for all damaged caused by the improper construction of their home, and that if we are forced to commence binding arbitration, we will assert, among other claims, a claim under Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. C. S. § 201-1 *et seq.*, which expressly authorizes the imposition of treble damages and attorneys' fees.

Before we commence arbitration, however, we propose that W.B. Homes reconsider its earlier denial of remediation work. Specifically, we believe that certain forensic, destructive testing will inform all involved on the scope of remediation ultimately necessary. To that end, we request that W.B. Homes agree to perform this further testing under the direction of both NIC and Tillman. If W.B. Homes refuses, we will commence with this work ourselves and no further courtesies will be extended. Please let me know as soon as possible if W.B. Homes is agreeable to performing this forensic work. If so, we will schedule it cooperatively so that both Messrs. Hendron and Tillman can direct accordingly.

Sincerely,

Stuart D. Lurie

cc:     Mr. Rodwige Desnoyers
        Mrs. Camille Desnoyers



EMPLOYMENT LITIGATION
COMMERCIAL LITIGATION
GENERAL COUNSEL SERVICES
EXECUTIVE ADVOCACY
NFL RETIREMENT AND DISABILITY

Stuart D. Lurie
(p) 484.693.0788
(f)  215.600.1728
Stuart@RosenthalLurie.com

*Reply to Exton Office*

January 21, 2015

***Via First Class Mail and E-Mail (jackb@wbhomesinc.com)***

Jack Boyd, Vice President of Operations
W.B. Homes, Inc.
404 Sumneytown Pike, Suite 200
North Wales, PA 19454

> Re:   **Rodwige and Camille Desnoyers**
> **592 Oakmont Dr. West, Telford, PA 18969**

Dear Mr. Boyd:

I write in follow-up to my letter of October 16, 2014, e-mail correspondence, and Monday's conference call regarding the Desnoyers' claim for warranty coverage for the defects detailed in the NIC report, which was provided to you over the summer.

During the call, we discussed the specifics of the forensic cutting we requested in my earlier letter.  Frank explained that each elevation of the home will require one or more cuts of the stucco.  These cuts are aimed at revealing, among other things, the thickness of the stucco, the attachment of the stucco to the framing or OSB sheathing, the condition of the OSB sheathing, and the adequacy of the drainage plane between the stucco application and the weather resistant barrier.  The work will also include the removal of at least one window of the home to reveal how it was installed and flashed.  The window will then be re-installed.

You agreed to provide a crew to perform the forensic work at W.B. Homes' expense.  Frank Hendron will direct the work and dictate where to cut, etc.  Your crew will also be responsible for re-installing the window and adequately patching the cuts.

As Frank and I discussed on the call, the purpose of the forensic cutting is two-fold.  One, it should put to rest any differing conclusions from prior moisture reports.  Two, it allows both parties to see the bare facts in terms of how the stucco exterior and windows were installed on

PHILADELPHIA
1500 JFK BOULEVARD
SUITE 1230
PHILADELPHIA, PA 19102

WWW.ROSENTHALLURIE.COM

EXTON
486 THOMAS JONES WAY
SUITE 210
EXTON, PA 19341

ROSENTHAL LURIE LLC
Page 2 of 2

the home.  As I also mentioned during the call, our intent is, quite frankly, to convince W.B. Homes to repair the home in the manner we believe it requires.  Often times this can save both parties time and money when compared to arbitration or litigation.  If we still cannot reach agreement on an appropriate scope of repair, then neither side is prejudiced, but both sides will know more than they do today.

        Please let me know if you believe I have missed or mischaracterized anything from our call.  We will contact you with some suggested dates for the forensic work, temperature permitting.

                            Sincerely,

                            Stuart D. Lurie

cc:    Mr. Rodwige Desnoyers
       Mrs. Camille Desnoyers
       Mr. Frank Hendron



w.b. Homes, inc.

*Building Your Neighborhood, One Home at a Time*

404 Sunneytown Pike - Suite 200 • North Wales, PA 19454
Tel: (215) 699-0800 • Fax: (215) 699-2722
www.wbhomesinc.com

February 5, 2015

Stuart D. Lurie
Rosenthal Lurie LLC
486 Thomas Jones Way
Suite 210
Exton, PA 18341

**RE:   Rodwige and Camille Desnoyers**
**       592 Oakmont Drive West, Telford, PA 18969**

Dear Mr. Lurie:

I am writing this letter in response to your January 21, 2015 letter and our most recent conference call. Let me start by saying we are very concerned about your statement in the next to last paragraph stating *"Our intent, quite frankly, is to convince W. B. Homes to repair the home in the manner we believe it requires"*. That sounds like your verdict is in despite the vastly conflicting data in the reports.  I am equally concerned that, based on the vastly conflicting data, that you are proposing a forensic cut.  That is an extremely invasive procedure and is the equivalent of cutting off your arm because 2 doctors disagree on how to treat a sprained wrist.  At this point it is absolute overkill and will result in significant devaluing of your client's home should it be determined, whether through arbitration or lawsuit that *"repairing the home in the manner we believe it requires"* is not actually required. In our opinion a forensic cut should not be the next step.

Let me remind you that your client settled on their home in August of 2010.  In the nearly 5 years since then we have not had a single complaint from them of water or moisture infiltration anywhere in the house.  Our inspector did a visual and non-invasive moisture meter and infra-red imaging of the interior of the property with no suspect signs of moisture intrusion.

Obviously 1 of the 2 inspections is wrong, or at best both are partially wrong.  Based on the conflicting reports our strong suggestion is that we get both inspectors on site together and we do a more extensive analysis through probes before we start cutting holes in their stucco that we are not going to be able to patch without some color differential.  As you know we had previously offered and suggested that your inspector

be present when ours was on site doing their inspection. That could have resolved a significant numbers of issues and concerns.  I am making that offer again and strongly suggest that we proceed in that manner.  If, after that re-inspection with both inspectors present we feel that a forensic cut and removal of a window(s) is necessary we can easily and quickly proceed in that fashion.  There is nothing to be gained by ignoring 2 conflicting inspections and rushing to judgment with the most invasive technique unless you don't believe the facts are that important in the analysis of the issue.

If the above is acceptable, please let us know at your earliest convenience

Sincerely,

Jack Boyd
Vice President Operations

JB/jsh

Cc:    Rodwige & Camille Desnoyers