IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MAIN STREET AMERICA** | : | **CIVIL ACTION** |
| **ASSURANCE COMPANY** | : | |
| | : | |
| **v.** | : | **NO. 21-3977** |
| | : | |
| **HOWARD LYNCH PLASTERING,** | : | |
| **INC.,** *et al* | : | |

## MEMORANDUM

**KEARNEY, J.**                                                                                         **February 14, 2022**

A business insurer asks us to declare its coverage obligations to an insured home builder seeking a defense or indemnity for losses caused by alleged faulty or defective construction of thirty-four homes. Every claim arises from a defaulted, defunct subcontractor's workmanship. The subcontractor purchased insurance requiring the insurer to defend and indemnify the subcontractor and home builder for losses arising from an "occurrence." An "occurrence" does not generally include defective construction under Pennsylvania law. We today address a present existing complaint in state court, one arbitration settled without notice to the insurer, and thirty-two homeowner complaints resolved by the home builder before a dispute process without notice to the insurer. The insurer asks us to declare it need not defend or indemnify its insured home builder and subcontractor in the pending lawsuit involving claims of defective construction. We find the insurer need not defend or indemnify the insured home builder and subcontractor in the pending lawsuit. We find the insurer need not indemnify the home builder in the resolved arbitration and in the other thirty-two homeowners' claims which the home builder (to its credit) resolved before a dispute process. We are not persuaded by the home builder's attempt to recharacterize the underlying claims as sounding in products liability. We enter summary judgment declaring the

insurer has no obligation to defend or indemnity the home builder or subcontractor in the pending lawsuit or indemnify the home builder for losses in the resolved claims.

**I.     Undisputed material facts.**

W.B. Homes, Inc. builds homes. It built homes in Montgomery County using Howard Lynch Plastering, Inc. as its subcontractor.[1] W.B. Homes required Howard Lynch to obtain liability insurance for its construction work.[2]

*Howard Lynch purchases commercial general liability insurance from Main Street.*

Howard Lynch purchased a commercial general liability insurance policy from Main Street America Assurance Company.[3] Main Street agreed to defend and indemnify Howard Lynch for damages caused by "bodily injury" or "property damage."[4] Main Street only covered bodily injury or property damage "caused by an 'occurrence.'"[5] The parties defined "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."[6] Main Street issued certificates of insurance to W.B. Homes under the policies.[7]

*The three types of claims against W.B. Homes and Howard Lynch.*

This dispute concerns three sets of claims against W.B. Homes involving the homes it constructed using Howard Lynch as its subcontractor.

First, William McGinnis and Rose Marie McGinnis sued W.B. Homes in the Montgomery County Court of Common Pleas (the "McGinnis Litigation").[8] The McGinnisses alleged W.B. Homes defectively constructed their home by installing missing flashing, gaps in sills, exposed wood, inadequate drainage, inadequate kickout flashing, improper control joints, inadequate window head flashing, and lack of flashing detail at stone/stucco intersections, among other defects.[9] The McGinnisses claimed these defects caused damages necessitating expensive repairs.[10] W.B. Homes filed a joinder complaint in the McGinnis Litigation against Howard

Lynch.[11] W.B. Homes alleged Howard Lynch must indemnify W.B. Homes for the McGinnisses' claims under a subcontractor agreement between W.B. Homes and Howard Lynch.[12] Main Street is defending Howard Lynch in the ongoing McGinnis Litigation subject to a reservation of rights.[13]

Second, Rodwige and Camille Desnoyers sued W.B. Homes in arbitration for defectively constructing their home (the "Desnoyers Arbitration").[14] The Desnoyers alleged many construction defects in their home, including inadequate or improper caulking, flashing, joints, stucco termination, and thickness of stucco.[15] The Desnoyers and W.B. Homes settled the arbitration without Main Street's involvement.[16] Nationwide Insurance Company notified Main Street of the Desnoyers Arbitration after the settlement.[17]

Third, homeowners of thirty-two homes in Montgomery County claimed W.B. Homes's construction defects caused them harm (the "Homeowner Claims").[18] W.B. Homes remediated the construction defects in all thirty-two homes without involving Main Street or litigating the claims.[19] W.B. Homes's insurance agent later sought coverage from Main Street for "reimbursement" of W.B. Homes's costs to repair property damage caused by Howard Lynch's allegedly defective construction.[20]

***Howard Lynch defaults; W.B. Homes admits claims against it concern defective construction.***

Main Street sued W.B. Homes and Howard Lynch in our Court.[21] Main Street seeks a declaratory judgment it need not defend or indemnify Howard Lynch or W.B. Homes in the McGinnis Litigation, Desnoyers Arbitration, and the Homeowner Claims.[22]

W.B. Homes admits Main Street's claim the McGinnis Litigation, Desnoyers Arbitration, and Homeowner Claims "seek damages caused by the allegedly defective construction" of the properties involved in those actions.[23] Main Street and W.B. Homes stipulated: "Each claim against W.B. Homes (and, by extension, against Howard Lynch), whether or not it has led to

litigation, 'seek[s] damages caused by the allegedly defective construction of the [h]omes.'"[24] Main Street also submitted stipulated facts signed by W.B. Homes with its Motion for summary judgment.[25] W.B. Homes again stipulated: "The homeowners' Claims and the claims alleged in the Legal Proceedings seek damages caused by the allegedly defective construction of the Homes."[26]

Howard Lynch did not answer Main Street's Complaint.[27] Our Clerk of Court entered default against Howard Lynch.

## II.   Analysis

Main Street moves for summary judgment.[28] It originally moved we declare Main Street need not defend or indemnify Howard Lynch or W.B. Homes in the McGinnis Litigation, Desnoyers Arbitration, and the Homeowner Claims.[29] Main Street later clarified it seeks a declaration regarding its duty to defend only for the McGinnis Litigation; it seeks only declarations regarding its duty to indemnify the Desnoyers Arbitration and Homeowner Claims.[30] Main Street argues it only agreed to cover "occurrences," but the McGinnis Litigation, Desnoyers Arbitration, and Homeowner Claims do not allege damages from "occurrences."[31] Main Street argues these three disputes concern damages from "the effects of faulty construction," which "are not 'occurrences'" under Pennsylvania law.[32] Main Street also argues W.B. Homes breached the insurance policies because W.B. Homes did not timely notify Main Street of its alleged coverage obligations and settled the Desnoyers Arbitration and the Homeowner Claims without Main Street's involvement.[33] Main Street alternatively seeks default judgment against Howard Lynch for its non-appearance.[34]

W.B. Homes responds the McGinnis Litigation, the Desnoyers Arbitration, and the Homeowner Claims arise from "occurrences" because they involved malfunctioning products, not

4

defective construction.[35] W.B. Homes argues Main Street must cover the alleged damages because the policy contained a "Products Completed Operations Hazard" permitting coverage.[36] Howard Lynch did not respond to Main Street's Motion.

We grant summary judgment to Main Street. Main Street has no duty to defend or indemnify W.B. Homes and Howard Lynch in the McGinnis Litigation because the McGinnisses allege damages from defective construction, which Main Street did not agree to cover. Main Street has no duty to indemnify W.B. Homes for sums paid to settle the Desnoyers Arbitration and Homeowner Claims because those disputes also concern construction defects.

"Under Pennsylvania law, an insurer has a duty to defend if the complaint filed by the injured party potentially comes within the policy's coverage."[37] "An insurer must defend its insured until it becomes absolutely clear that there is no longer a possibility that the insurer owes its insured a defense."[38] We apply the "four corners rule" to determine whether an insurer must defend its insured.[39] "Under the four corners rule, a court in determining if there is coverage does not look outside the allegations of the underlying complaint or consider extrinsic evidence."[40] We view the allegations of the underling action as true and liberally construe them in favor of the insured.[41]

An insurer's duty to indemnify is narrower than its duty to defend.[42] "A duty to indemnify does not arise until the insured is found liable for a covered claim."[43] The duty to indemnify "flows from a determination that the complaint triggers coverage."[44] The duty to indemnify inquiry "is fact-intensive insofar as it requires a determination that the insurer's policy actually covers the incident in question."[45] While we "can decide an insurer's duty to defend based solely on the pleadings in the underlying case," the duty to indemnify "depends upon the existence or nonexistence of facts" establishing coverage.[46]

### A. Main Street need not defend or indemnify W.B. Homes or Howard Lynch in the McGinnis Litigation.

Main Street agreed to cover damages arising from an "occurrence."[47] An "occurrence" does not generally include defective construction under Pennsylvania law.[48] The Pennsylvania Supreme Court reasons commercial general liability policies define an "occurrence" as an "accident," but "faulty workmanship does not constitute an 'accident.'"[49] A contrary interpretation would convert commercial general liability policies "into performance bonds, which guarantee the work, rather than . . . an insurance policy, which is intended to insure against accidents."[50] Pennsylvania courts thus find commercial general liability policies do not cover defective construction or damages to the property caused by defective construction.[51]

Main Street need not defend or indemnify W.B. Homes in the McGinnis Litigation because the McGinnises' claims against W.B. Homes concern construction defects.[52] The McGinnisses alleged W.B. Homes defectively constructed their home, by, among other things, installing missing flashing, gaps in sills, exposed wood, inadequate drainage, inadequate kickout flashing, improper control joints, and inadequate window head flashing.[53] The McGinnisses claimed these defects caused damages to their home, including the need to remediate patios, steps, landscaping, windows, and other areas.[54] Each count the McGinnisses brought against W.B. Homes alleged failure to construct their home in a workmanlike manner or failure to use proper construction techniques.[55] The McGinnisses squarely allege W.B. Homes defectively constructed their home—as W.B. Homes thrice admitted during this litigation.[56]

Main Street similarly need not defend or indemnify Howard Lynch in the McGinnis Litigation because W.B. Homes's joinder complaint against Howard Lynch asserts claims of construction defects. W.B. Homes filed a joinder complaint in the McGinnis Litigation against Howard Lynch, seeking indemnification from Howard Lynch for the same damages the

McGinnisses allege against W.B. Homes. W.B. Homes did not assert unique facts against Howard Lynch; W.B. Homes simply alleged Howard Lynch must indemnify it if W.B. Homes is liable to the McGinnisses.[57] W.B. Homes's claims thus arise out of the same set of facts as the McGinnesses' claims: defective construction.[58] These claims are not covered.[59]

The Pennsylvania Superior Court in *Millers Capital Ins. Co. v. Gambone Bros. Development Co.* found a commercial general liability policy did not cover damages caused by "construction defects and product failures" from the use of "defective stucco," as here.[60] The insurer sought a declaration it did not need to defend or indemnify its insured for damages arising from the insured's subcontractors' faulty stucco installation in homes.[61] The court found no duty to defend because the allegations regarding "defective stucco exteriors, windows, and other artificial seals" were "based on claims for faulty workmanship."[62] The McGinnisses—and, by extension, W.B. Homes—bring similar claims here.

W.B. Homes's contrary arguments do not persuade us. W.B. Homes argues our Court of Appeals's decision in *Nautilus Insurance Co. v. 200 Christian Street Partners LLC*[63] compels Main Street to defend. In *Nautilus*, our Court of Appeals applied the Pennsylvania Superior Court's decision in *Indalex Inc. v. National Union Fire Insurance Co.*[64] In *Indalex*, the court found an insurer had a duty to defend "product-liability-based tort claims" under a commercial general liability policy.[65] The court reasoned the underlying case involved "an off-the-shelf product that failed and allegedly caused property damage and personal injury."[66] The underlying case "framed" its claims "in terms of a bad product, which can be construed as an 'active malfunction,' and not merely bad workmanship."[67] W.B. Homes argues *Indalex* and *Nautilus* compel Main Street to cover the McGinnis Litigation because the McGinnisses alleged the use of faulty materials and the active malfunction of products.

7

We disagree. The claims in *Indalex* differ from the McGinnises' claims. The McGinnises do not bring products liability tort claims as in *Indalex*. They repeatedly frame their allegations as "construction defects," not defects caused by a malfunctioning off-the-shelf product.[68] W.B. Homes does not cite, nor do we find, an allegation by the McGinnises a "bad product" caused their damages as in *Indalex* and *Nautilus*. The same goes for W.B. Homes' joinder complaint against Howard Lynch: W.B. Homes repeatedly alleged Howard Lynch performed faulty construction. W.B. Homes does not sue Howard Lynch for products liability tort claims; W.B. simply seeks indemnity for the McGinnises' claims against W.B. Homes. W.B. Homes did not allege Howard Lynch used a "bad product."[69] And W.B. Homes repeatedly admitted in this litigation the McGinnis Litigation concerns defective construction. Judges in our District routinely reject attempts to recast allegations of "faulty workmanship" as "active malfunction[s]."[70] Neither *Indalex* nor *Nautilus* obligate Main Street to defend or indemnify W.B. Homes or Howard Lynch in the McGinnis Litigation.

W.B. Homes also argues the policy's language regarding the "products-completed operations hazard" shows the policy must cover defective construction. The policy specifically excludes coverage for property damages requiring remediation because "'your work' was incorrectly performed on it."[71] The exclusion specifies, however, it "does not apply to 'property damage' included in the 'products-completed operations hazard.'"[72] The "products-completed operations hazard" includes "all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work.'"[73] W.B. Homes argues the exclusion proves the policy covers construction defects. W.B. Homes reasons the exclusion would not need to carve-out property damage included in the "products-completed operations hazard" if the policy did not cover such damages in the first place. And, because the products-

8

completed operations hazard covers property damage, W.B. Homes reasons the policy must cover property damage like the kind alleged here. But judges in our Circuit repeatedly reject this very argument.[74] They reason "the products-completed operations hazard . . . does not do away with the overall requirement that there is only coverage if there is an occurrence."[75] We agree with our colleagues. W.B. Homes must first show a covered "occurrence" before we may consider whether exclusions and their exceptions apply. W.B. Homes does not make such a showing. Main Street has no duty to defend, and thus no duty to indemnify, W.B. Homes or Howard Lynch in the McGinnis Litigation.

### B. Main Street need not indemnify W.B. Homes for sums paid to settle the Desnoyers Arbitration.

Main Street does not seek our declaration regarding its duty to defend the now-finished Desnoyers Arbitration; it only seeks our declaration regarding its duty to indemnify.[76] W.B. Homes raises similar arguments regarding Main Street's duty to indemnify in the Desnoyers Arbitration as it raised regarding the McGinnis Litigation. We reject W.B. Homes's arguments.

The Desnoyers Arbitration did not involve damages caused by an "occurrence," so Main Street need not indemnify W.B. Homes for its settlement of the Desnoyers Arbitration. The only evidence we possess regarding the Desnoyers Arbitration is the arbitration complaint and the parties' stipulations today. The Desnoyers explicitly requested relief for "significant construction defects," including inadequate or improper caulking, flashing, joints, stucco termination, and thickness of stucco.[77] The Desnoyers did not allege product liability claims. W.B. Homes admitted the Desnoyers Arbitration concerned claims of defective construction.[78] The Desnoyers Arbitration thus concerned construction defects. Main Street need not indemnify W.B. Homes for sums it paid to settle the Desnoyers Arbitration.

9

### C. Main Street need not indemnify W.B. Homes for sums it paid to settle the Homeowner Claims.

As with the Desnoyers Arbitration, Main Street only seeks our declaration it need not indemnify W.B. Homes for its settlements of the Homeowner Claims.[79] W.B. Homes's arguments regarding the Homeowner Claims read the same as its arguments regarding the McGinnis Litigation and the Desnoyers Arbitration. The arguments fail for the same reasons.

The Homeowner Claims concern defective construction. The parties submitted an inspection report which details damages at one of the thirty-two homes involved in the Homeowner Claims. The parties agree the submitted report details damage "substantially similar" to other homes in the Homeowner Claims.[80] The report details damages caused by construction defects. The report notes, for example, stucco installation violating "industry details";[81] failure to install expansion joints and vertical control joints;[82] failure to install kickout flashing;[83] improperly sealed window frames;[84] improperly sealed door frames with missing sealant;[85] improperly terminated stucco/stone on the porch;[86] and so forth.[87] These are construction defects.

W.B. Homes cites two pages of another inspection report from another home involved in the Homeowner Claims. The report mentions a sealant joint which "was failing adhesively" and a kickout which "was split at the time of installation."[88] W.B. Homes argues these two references to possible product malfunctions bring the Homeowner Claims into *Indalex*'s realm. We disagree. These ambiguous references to possible product defects are part of a broader report detailing construction defects.[89] The upshot of the Homeowner Claims is not product liability, it is defective construction. W.B. Homes admitted this fact repeatedly during this litigation. Main Street need not indemnify W.B. Homes for its settlements of the Homeowner Claims.[90]

**III.    Conclusion**

Main Street is entitled to judgment as a matter of law on its complaint asking we declare it has no obligation to defend or indemnify W.B. Homes and Howard Lynch in the ongoing case in Montgomery County. Main Street is also not obligated to indemnity W.B. Homes for its losses in resolving the Desnoyers Arbitration or the thirty-two Homeowner Claims.

---

[1] ECF Doc. No. 14-1 at 3 ¶ 5 (stipulating Howard Lynch performed services for W.B. Homes as a subcontractor).

[2] App'x at 205.

[3] Joint Stip. of Facts (ECF Doc. No. 19-2) at 4 ¶ 1.

[4] App'x at 11.

[5] *Id.*

[6] *Id.* at 24.

[7] *Id.* at 495–506.

[8] *Id.* at 213 (citing *William McGinnis, et al. v. W.B. Homes, Inc., et al.*, No. 2018-19272 (Montgomery Cnty. Ct. Com. Pl.)).

[9] *See id.* at 222–23 ¶ 60 (listing defects in McGinnis home).

[10] *Id.* at 224 ¶¶ 70–72.

[11] *See id.* at 414.

[12] *Id.* at 418–19 ¶¶ 14–15.

[13] Joint Stip. of Facts 4 ¶ 9; *see also* ECF Doc. No. 1 ¶ 8; ECF Doc. No. 9 ¶ 8.

[14] Joint Stip. of Facts at 4 ¶¶ 3–4; App'x at 422.

[15] App'x at 423 ¶ 6.

[16] Joint Stip. of Facts at 4 ¶ 4.

[17] *Id.* at 4 ¶ 6.

[18] *Id.* at 1 ¶ B; *id.* at 4 ¶ 2 (stipulating the homeowners made claims for "allegedly defective construction").

[19] *Id.* at 4 ¶ 11.

[20] *Id.* at 4 ¶ 12.

[21] ECF Doc. No. 1.

[22] *Id.* at 32 (Wherefore clause at (A), (D)).

[23] ECF Doc. No. 1 ¶ 5 (alleging the "Claims" and "Legal Proceedings" seek damages caused by the allegedly defective construction of the "Homes"); ECF Doc. No. 9 ¶ 5 (W.B. Homes admitting the claim). Main Street defined "Claims" as the Homeowner Claims. ECF Doc. No. 1 ¶ 3. It defined "Legal Proceedings" as the McGinnis Litigation and the Desnoyers Arbitration. *Id.* ¶ 4. It defined "Homes" as the thirty-four homes involved in the Claims and Legal Proceedings. *Id.* ¶ 2.

[24] ECF Doc. No. 14-1 at 3 ¶ 6 (first alteration in original).

[25] ECF Doc. No. 19-2.

[26] *Id.* at 4 ¶ 2.

[27] ECF Doc. No. 11.

[28] ECF Doc. No. 19.

[29] ECF Doc. No. 19-4 at 1.

[30] ECF Doc. No. 22 at 8 (clarifying declarations Main Street seeks).

[31] ECF Doc. No. 19-1 at 13.

[32] *Id.*

[33] *Id.* at 20–23.

[34] *Id.* at 23–25.

[35] ECF Doc. No. 20.

[36] *Id.*

[37] *Sikirica v. Nationwide Ins. Co.*, 416 F.3d 214, 225 (3d Cir. 2005).

[38] *Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 673–74 (3d Cir. 2016).

[39] *Id.* at 673.

[40] *Id.* The "four corners rule" is "also known as the 'eight corners' rule" because we may consider both the underlying complaint and the insurance policy to determine coverage. *Id.* at 673 n.9.

[41] *Id.* (quoting *Frog, Switch & Mfg Co. v. Travelers Ins. Co.*, 193 F.3d 742, 746 (3d Cir. 1999)).

[42] *Id.* (quoting *Sikirica*, 416 F.3d at 225).

[43] *Vito v. RSUI Indem. Co.*, 435 F. Supp. 3d 660, 667 (E.D. Pa. 2020).

[44] *QBE Ins. Corp. v. Walters*, 148 A.3d 785, 788 (Pa. Super. Ct. 2016).

[45] *Hartford Fire Ins. Co. v. Sylvan Inc.*, No. 09-3115, 2010 WL 11561109, at *1 n.1 (E.D. Pa. Nov. 22, 2010).

[46] *NIC Ins. Co. v. PJP Consulting, LLC*, No. 09-0877, 2010 WL 4181767, at *5 (E.D. Pa. Oct. 22, 2010) (quoting *C.H. Heist Carbie Corp. v. Am. Home. Assurance Co.*, 640 F.2d 479, 483 (3d Cir. 1981)).

[47] App'x at 11.

[48] *See Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Com. Union Ins. Co.*, 908 A.2d 888, 900 (Pa. 2006).

[49] *Id.* at 899–900.

[50] *Id.* at 899.

[51] *See, e.g.*, *Millers Cap. Ins. Co. v. Gambone Bros. Dev. Co.*, 941 A.2d 706, 713 (Pa. Super. Ct. 2007).

[52] Main Street appears to concede W.B. Homes is an additional insured under the policies Howard Lynch purchased from Main Street. ECF Doc. No. 22 at 5.

[53] *See* App'x at 222–23 ¶ 60.

[54] *Id.* at 224 ¶¶ 70–72.

[55] *Id.* at 229–52. The McGinnisses brought counts for piercing the corporate veil and successor liability against W.B. Homes. *Id.* at 254–58. These counts explain theories of liability rather than asserting unique facts creating liability.

---

[56] ECF Doc. No. 9 ¶ 5; ECF Doc. No. 14-1 at 3 ¶ 6; ECF Doc. No. 19-2 at 4 ¶ 2. Howard Lynch's default causes its admission of Main Street's claims. *See* Fed. R. Civ. P. 8(b)(6).

[57] *See* App'x at 418–19 ¶¶ 14–15.

[58] *See, e.g.*, *Union Ins. Co. v. Selective Ins. Co. of Am.*, No. 17-2674, 2018 WL 4335497, at *3 (E.D. Pa. Sept. 11, 2018) (finding a Pennsylvania joinder complaint did not "trigger a coverage obligation" because it "incorporates by reference the facts contained in the [original] complaint"; namely, "allegations of faulty workmanship").

[59] We note Howard Lynch's subcontractor status does not make it covered. *See Gambone*, 941 A.2d at 715 (rejecting insured's argument a commercial general liability policy covered its subcontractors' work, reasoning such an interpretation would "render the definition of 'occurrence' mere surplusage in every instance where a plaintiff sues a contractor for faulty work performed by a subcontractor on the contractor's behalf"). We recognize we recently found commercial general liability policies can cover subcontractors' faulty workmanship under Delaware law. *See Pa. Nat'l Mut. Cas. Ins. Co. v. Zonko Builders, Inc.*, No. 21-437, 2021 WL 4061564, at *8 (D. Del. Sept. 7, 2021). Our analysis in *Zonko Builders* is inapposite today because Delaware courts have "not extensively analyzed the definition of 'occurrence' in commercial general liability policies containing subcontractor exceptions." *Id.* at *6. Pennsylvania courts, conversely, have already analyzed the question.

[60] 941 A.2d at 709.

[61] *Id.* at 708–10.

[62] *Id.* at 713.

[63] 819 F. App'x 87 (3d Cir. 2020).

[64] 83 A.3d 418 (Pa. Super. Ct. 2013); *see Nautilus*, 819 F. App'x at 89.

[65] *Indalex*, 83 A.3d at 424–25. The policy defined "occurrence" as bodily injury or property damage "neither expected nor intended from the standpoint of the insured." *Id.* at 425. This differed from the definition in *Kvaerner*, where the policy defined "occurrence" as "an accident, including continuous or repeated exposure to substantially the same or general harmful conditions." *Id.* (quoting *Kvaerner*, 908 A.2d at 897). We need not examine whether these different definitions further distinguish *Indalex* from this case because *Indalex* is inapposite even assuming it handled the same policy language as we face today.

[66] *Id.* at 424.

[67] *Id.*

---

[68] *See* App'x at 222 ¶ 60 (listing "numerous construction defects with respect to" the McGinnisses' home); *id.* at 223 ¶ 61 (alleging damages to the home caused by the "construction defects"); *id.* at 224 ¶ 68 (referencing plaintiffs' demand upon the defendants "to remediate the construction defects").

[69] *See id.* at 416 ¶ 8 (Howard Lynch contracted for the "construction of the Home"); *id.* at 416–17 ¶ 9 (Howard Lynch is "the subcontractor for construction services and materials to construct the stucco exterior cladding system").

[70] *See, e.g.*, *Evanston Ins. Co. v. Tristar Prod., Inc.*, 537 F. Supp. 3d 798, 817–18 (E.D. Pa. 2021) (where underlying complaint alleged damages caused by insured's use of their "own deficient products," the claims sounded in "faulty workmanship," not "active malfunction"); *see also Quality Stone Veneer, Inc. v. Selective Ins. Co. of Am.*, 229 F. Supp. 3d 351, 358–60 (E.D. Pa. 2017) (distinguishing *Indalex* and compiling cases).

[71] App'x at 17.

[72] *Id.*

[73] *Id.* at 24.

[74] *See, e.g.*, *Sapa Extrusions, Inc. v. Liberty Mut. Ins. Co.*, No. 13-2827, 2018 WL 2045496, at *12 (M.D. Pa. May 1, 2018) (finding the products-completed operations hazard could only provide coverage through a limitation to an exclusion if there is "an 'occurrence' triggering coverage," and thus triggering the exclusion, in the first place), *aff'd in part, vacated in part on other grounds, remanded*, 939 F.3d 243 (3d Cir. 2019); *Quality Stone*, 229 F. Supp. 3d at 364; *Westfield Ins. Co. v. Rustic Exteriors, Inc.*, No. 11-6011, 2013 WL 12146532, at *7 (E.D. Pa. Mar. 21, 2013) (the products-completed operations hazard does not alter the policy's requirement of an "occurrence" triggering coverage in the first place).

[75] *Quality Stone*, 229 F. Supp. 3d at 364.

[76] *See* ECF Doc. No. 22 at 8.

[77] App'x at 423 ¶ 6.

[78] ECF Doc. No. 9 ¶ 5; ECF Doc. No. 14-1 at 3 ¶ 6; ECF Doc. No. 19-2 at 4 ¶ 2.

[79] ECF Doc. No. 22 at 8.

[80] Joint Stip. of Facts at 5 ¶¶ 13–14.

[81] App'x at 465.

[82] *Id.* at 466.

15

[83] *Id.* at 467.

[84] *Id.* at 468.

[85] *Id.* at 469.

[86] *Id.* at 470.

[87] *Id.* at 471–84 (detailing similar construction defects).

[88] ECF Doc. No. 20 at 8 (citing App'x at 910–11).

[89] *See, e.g.*, App'x at 917 (conclusion of report detailing "inadequate installation" of cladding, flashing, and kickout flashing; improper termination and sealing of stucco; and non-caulked windows).

[90] We need not address Main Street's remaining arguments regarding W.B. Homes's untimely notification of the lawsuit and Howard Lynch's default.